

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 09 2018

JAMES W. McCORMACK, CLERK
.By:_____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN (Little Rock) DIVISION

| | | |
|---|---|---|
| **DR. JULIUS J. LARRY III, Individually And in his Official Capacity as Publisher – The Little Rock Sun Community Newspaper, and on behalf of all other Similarly-situated African Americans Residing in the Southeast Quadrant of the State of Arkansas** § § § § | | |
| **PLAINTIFFS,** | | |
| | § | |
| **VS.** | § | **CASE NUMBER:** *4:18-cv-116-KGB* |
| | § | |
| **STATE OF ARKANSAS;  ASA HUTCHINSON, in his Official Capacity as Governor of the State of Arkansas; LESLIE RUTLEDGE, in her Official Capacity as Attorney General of the State of Arkansas; MARK MARTIN, in his Official Capacity as Arkansas Secretary of State and the Arkansas Legislature, in their Official Capacities** § § § § § | | This case assigned to District Judge *Baker* and to Magistrate Judge *Kearney* |
| **DEFENDANTS.** | | |

## REQUEST FOR THREE JUDGE PANEL TO CHIEF U.S. DISTRICT JUDGE BRIAN S. MILLER AND TEMPORARY RESTRAINING ORDER INSTANTER WITH MEMORANDUM OF POINTS AND AUTHORITIES

### TO THE HONORABLE COURT:

Comes Now, Dr, Julius J. Larry III, individually and in his official capacity as Publisher of the

Little Rock Sun Community Newspaper, and on behalf of all those similarly situated African

1

Americans residing in the Southeast quadrant of the State of Arkansas and files this Request for Three Judge Panel to Chief U.S. District Judge Brian S. Miller for a Temporary Restraining Order, pursuant to 28 U.S.C. § 2284 - to remedy racial gerrymandering of the First Congressional District of Arkansas, by enforcing Section 2 of the Voting Rights Act of 1965, as amended and the Fourteenth and Fifteenth Amendments to the U.S. Constitution. He is challenging the constitutionality of the apportionment of the congressional districts as presently drawn in Arkansas.

Plaintiffs seek declaratory and injunctive relief against defendants and the existing congressional district plan, as drawn and adopted by the Arkansas Legislature presently. (See Exhibit A).

 

1. The existing plan denies and abridges Plaintiffs' right to vote on account of their race - African American. Defendants drew and adopted the existing plan with the intent and effect of diluting the voting strength of African American voters in southeastern Arkansas and denying them an equal opportunity to elect candidates of their choice to the U.S. Congress. In fact, no African American has ever been elected to the U.S. Congress from the State of Arkansas since Arkansas became a state. This was no accident, but the result of systematic, institutionalized, racial gerrymandering over the years. Defendants packed like-minded white voters in the Northeast into the 1st Congressional District and the results

are prima facie evidence of a Section 2 violation of the Voting Rights Act of 1965, as amended.  (See Exhibit B- African American Demographics in AR – Statewide in 2010).



2.  Section 2 of the Voting Rights Act prohibits two types of discrimination: **"vote denial"**, in which a person is denied the opportunity to cast a ballot or to have his vote properly counted, and **"vote dilution",** in which the strength or effectiveness of a person's vote is diminished.  Most Section 2 litigation has concerned vote dilution, especially claims that a jurisdiction's redistricting plan or use of at-large/multimember elections prevents minority voters from casting sufficient votes to elect their preferred candidates.  An at-large election can dilute the votes cast by minority voters by allowing a cohesive majority group to win every legislative seat in the jurisdiction. Redistricting plans can be **gerrymandered** to

dilute votes cast by minorities by **"packing"** high numbers of minority voters into a small number of districts or **"cracking"** minority groups by placing small numbers. In the First Congressional District of Arkansas, defendants packed the district with like-minded white voters in the Northeastern half of the district to dilute the Black votes of the residents of the Southeastern half of the gerrymandered district.

**Jurisdiction and Venue**

3. **A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body. 28 U.S.C. § 2284.**

**(b)  In any action required to be heard and determined by a district court of three judges under subsection (a) of this section, the composition and procedure of the court shall be as follows:**

**(1) Upon the filing of a request for three judges, the judge to whom the request is presented shall, unless he determines that three judges are not required, immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. The judges so designated, and the judge to whom the request was presented, shall serve as members of the court to hear and determine the action or proceeding.**

**(2) If the action is against a State, or officer or agency thereof, at least five days' notice of hearing of the action shall be given by registered or certified mail to the Governor and attorney general of the State.**

4. Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U. S. C. §§ 1331, 1343(a)(3 )  and (4), and  § 2201, and 42 U. S. C. §§ 1973j (f), §1983, and § 1988.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

6. Plaintiffs request that a three-judge court be convened pursuant to 28 U.S.C. § 2284.

**Parties - Plaintiffs**

7.   The Plaintiffs are each and all residents, citizens and registered voters within Union;

Ashley; Chicot; Drew; Lincoln; Jefferson; Pulaski; Desha; Arkansas; Phillips; Monroe; Lee; St.

Francis; Crittenden; and Cross Counties.  The race and color of each Plaintiff is African

American and Black.

**Parties – Defendants**

8.  All defendants herein, by information and belief,  are jointly and severally responsible

for the creation, approval and adoption of the 1st Congressional District's racially gerrymandered

map which has denied Black voters in the Southeastern part of the district, their  right to elect

candidates of their choice to the U.S. Congress.


**Statement of the Facts**

9.    At issue in this litigation is the racially gerrymandered First Congressional District of

Arkansas, as drawn by the defendant, Arkansas Legislature, allegedly based on the 2010 census

and approved on April 20, 2011 and became law.  The First Congressional District is  composed

of the   counties of – **Greene;  Clay;  Randolph;  Fulton;  Baxter;  Izard;  Sharp;  Lawrence;**

**Craighead;  Searcy;  Stone;  Cleburne;  Independence;  Jackson;  Poinsett;  Mississippi;**

**Woodruff;  Prairie;  Lonoke;  Cross;  Crittenden;  St.  Francis;  Lee;  Monroe;  Phillips;**

**Arkansas; Desha; Jefferson; Lincoln and Chicot. (30 Counties**).


10.   Presently, the First Congressional District   covers over **one-third of the State of**

**Arkansas** –and nearly **one-half** of the counties statewide - **East of the White River, from the**

**Missouri Line to the Louisiana Line**, where a majority of the African American population lives

in the Southeastern quadrant of the state. The 1st Congressional District **is unusually large** and suspect. The Southeast quadrant of Arkansas has a population of African Americans of voting age that is sufficiently large and geographically compact to constitute a majority in a statewide district. The area where this is possible includes the following counties: **Union; Ashley; Chicot; Drew; Lincoln; Jefferson; Pulaski; Desha; Arkansas; Phillips; Monroe; Lee; St. Francis; Crittenden; and Cross. (15 Counties).**



Dividing the state into four (4) quadrants, more or less, and eliminating the so-called **Fayetteville Finger**, is the best configuration for effectuating the will of the People of Arkansas, and the least restrictive way to remedy the racial gerrymandering that has been institutionalized in the 1st Congressional District since Arkansas became a state. (See Exhibit C- Newly Drawn Map).



This new map represents the true diverse interests of each quadrant of the state of Arkansas.
This map shows the large contiguous geographically compact area to constitute a majority in a
re-drawn 1st Congressional District, which resembles Lady Liberty praying for Justice.

## Legislative history

11. **Section 2 of the Voting Rights Act of 1965** prohibits any jurisdiction from implementing
a "voting qualification or prerequisite to voting, or standard, practice, or procedure ... in a manner
which results in a denial or abridgement of the right ... to vote on account of race," color, or
language minority status. The Supreme Court has allowed private plaintiffs to sue to enforce this
prohibition. In ***City of Mobile v. Bolden*** (1980), the Supreme Court held that, as originally enacted
in 1965, Section 2 simply restated the Fifteenth Amendment and thus prohibited only those voting
laws that were intentionally enacted or maintained for a discriminatory purpose. **Senate Judiciary**

**Committee Chairman, Strom Thurmond and House Speaker, Tip O'Neill** responded by
passing an amendment to the Voting Rights Act, and **President Ronald Reagan signed it into
law** on June 29, 1982. Congress's amended Section 2 to create a **"results" test**, which prohibits
any voting law that has a discriminatory effect, **<u>irrespective of whether the law was intentionally
enacted or maintained for a discriminatory purpose.</u>** The 1982 amendments provided that the
results test does not guarantee protected minorities a right to proportional representation. Plaintiffs
herein are not seeking "proportional representation", but **an equal opportunity** to elect their
preferred candidate to the U.S. Congress.

12. When determining whether a jurisdiction's election law violates this general prohibition,
courts have relied on factors enumerated in the **Senate Judiciary Committee report** associated
with the 1982 amendments **("Senate Factors"),** including:

1. **The history of official discrimination in the jurisdiction that affects the right to vote;**
2. **The degree to which voting in the jurisdiction is racially polarized;**
3. **The extent of the jurisdiction's use of majority vote requirements, <u>unusually large
   electoral districts</u>, prohibitions on bullet voting, and other devices that tend to
   enhance the opportunity for voting discrimination;**
4. **Whether minority candidates are denied access to the jurisdiction's candidate slating
   processes, if any;**
5. **The extent to which the jurisdiction's minorities are discriminated against in
   socioeconomic areas, such as education, employment, and health;**
6. **Whether overt or subtle racial appeals in campaigns exist;**
7. **The extent to which minority candidates have won elections;**
8. **The degree that elected officials are unresponsive to the concerns of the minority
   group; and**
9. **Whether the policy justification for the challenged law is tenuous.**

The report indicates that not all or a majority of these factors need to exist for an electoral device
to result in discrimination, and it also indicates that this list is not exhaustive, allowing courts to
consider additional evidence at their discretion.

## A. Senate Factors

### 1. History of Official Discrimination that affects the right to vote –

Arkansas has a long and violent history of discrimination in voting targeted against its African American communities in the state. Free Blacks were run out of the state of Arkansas in 1859 when the Arkansas General Assembly passed a new law to make them slaves if they did not leave. Many free Blacks were Army veterans of the War of 1812, who settled in Arkansas before it was a state; including Peter Caulder, James Larry, William Tillman, Henry Larry, Ben Turner and many others. Many free Blacks left Arkansas, while others moved east to the Mississippi River to live with the Black Mississippi Choctaw. The land owned by the free Blacks was taken by whites, under color of law, including Caulder's Bluff at Fort Smith. The Larry family settled in Helena-West Helena after Edward Larry, W.L. Lovelace, James Larry and Curtis Larry served in the all-Black 2nd Arkansas Infantry Regiment, which won the Battle of Helena on July 4, 1863. However, this great Union victory by its Black soldiers went unnoticed in history. Helena and its Black residents were never a part of the Confederacy, like the rest of Arkansas. Today, they are the poorest of the poor, residing in the "Arkansas Delta" and disenfranchised by defendants in Little Rock. For them, democracy has been nullified in the 1st Congressional District by defendants herein.

### 2. Racially polarized voting in 1st Congressional District -

Plaintiffs respectfully request the Court to take judicial notice of the factual findings and holdings in **Jeffers v. Clinton**, 730 F.Supp 196, 208-209 (E.D. Ark. 1989), where the court found that elections in eastern Arkansas were racially polarized.

The problem in the 1st Congressional District is more egregious in 2018 than in 1989. **See Table 1**. (Data from defendant, Secretary of State of Arkansas).

**TABLE 1**

**Arkansas State General Election**
**November 6, 2012**
Website last updated 11/21/2012 11:00:37 AM CST

Registered Voters: 1,618,320
Ballots Cast: 1,078,548
Voter Turnout: 66.65 %

Counties Partially Reported:    0 of 75
Counties Completely Reported:    75 of 75
Counties Percent Reported:    100.00 %

## U.S. Congressional District 1

| COUNTY | WINNER | Plaintiffs' Preferred Candidate | Percent Voting For Preferred Candidate | Votes Cast For Preferred Candidate | Percent Black Population |
|--------|--------|--------|--------|--------|--------|
| Greene | Republican | Democrat | 36.28 | 4,843 | .6 |
| Clay | Republican | Democrat | 37.76 | 1,884 | .3 |
| Randolph | Republican | Democrat | 38.11 | 2,227 | .7 |
| Fulton | Republican | Democrat | 33.21 | 1,689 | .3 |
| Baxter | Republican | Democrat | 26.47 | 5,011 | .2 |
| Izard | Republican | Democrat | 33.22 | 1,727 | 1.3 |
| Sharp | Republican | Democrat | 33.10 | 2,378 | .5 |
| Lawrence | Republican | Democrat | 39.90 | 2,199 | .8 |
| Craighead | Republican | Democrat | 39.37 | 12,400 | 13.1 |
| Searcy | Republican | Democrat | 21.61 | 724 | .1 |
| Stone | Republican | Democrat | 29.59 | 1,550 | .1 |
| Cleburne | Republican | Democrat | 24.85 | 2,821 | .3 |

| | | | | | |
|---|---|---|---|---|---|
| *Independence* | *Republican* | *Democrat* | *29.45* | *3,572* | *2* |
| *Jackson* | *Republican* | *Democrat* | *44.30* | *2,312* | *16.7* |
| *Poinsett* | *Republican* | *Democrat* | *40.76* | *3,056* | *7.2* |
| *Mississippi* | *Democrat* | *Democrat* | *47.89* | *6,049* | *34* |
| *Woodruff* | *Democrat* | *Democrat* | *51.33* | *1,351* | *27.5* |
| *Prairie* | *Republican* | *Democrat* | *33.96* | *1,042* | *12.2* |
| *Lonoke* | *Republican* | *Democrat* | *25.54* | *6,049* | *6* |
| *Cross* | *Republican* | *Democrat* | *37.21* | *2,402* | *22.2* |
| *Crittenden* | *Democrat* | *Democrat* | *53.77* | *8,538* | *51.2* |
| *St. Francis* | *Democrat* | *Democrat* | *57.68* | *4,647* | *51.9* |
| *Lee* | *Democrat* | *Democrat* | *62.20* | *2,055* | *55.3* |
| *Monroe* | *Democrat* | *Democrat* | *51.20* | *1,574* | *40.9* |
| *Phillips* | *Democrat* | *Democrat* | *61.90* | *4,642* | *63.1* |
| *Arkansas* | *Republican* | *Democrat* | *39.71* | *2,510* | *24.5* |
| *Desha* | *Democrat* | *Democrat* | *62.47* | *2,625* | *41.8* |
| *\*\*Jefferson* | *Democrat* | *Democrat* | *67.15* | *\*\*\*327* | *55.1* |
| *Lincoln* | *Republican* | *Democrat* | *45.66* | *1,672* | *29.9* |
| *Chicot* | *Democrat* | *Democrat* | *64.07* | *2,757* | *54.1* |

*\*\* -The other part of Jefferson County is in the 4th Congressional District*

Noted Oral Historian, retired Educator and Civil Rights activist for over 65 years, Mrs. Annie McDaniel Abrams explained, in her Affidavit attached herein, the racial polarization and bloc voting of whites when Joyce Elliott, a prominent Black Democratic Arkansas legislator, ran for U.S. Congress from the 2nd Congressional District against Tom Griffin, a white Republican

political novice who had never held any elected office.  Then-governor Beebe stated that neither

he nor the Democratic Party was going to help Joyce Elliott be elected to the 2nd Congressional

District **"because Arkansas did not have but four eligible seats due to population and y'all**

**don't deserve to have one of those four seats"**. (See – Affidavit – Mrs. Annie Abrams).

As a result of racial animus and white bloc voting, Tom Griffin won over Joyce Elliott because

white Democrats voted for the white Republican along racial lines, rather than vote for a Democrat

who happened to be a Black female with many years' experience in government and education.

Joyce Elliott was a very loyal and dedicated member of the Democratic Party and a long-term

officer in the Democratic Party.  Most egregiously, by information and belief, neither the

Republican Party nor the Democratic Party has ever supported an African American candidate for

the U.S. Congress from the 1st Congressional District of Arkansas or any other congressional

district.

**CHART 2**

## New Proposed U.S. Congressional District 1

### (Based on 2012 Presidential Election Results)

| COUNTY | WINNER | Preferred Candidate | Percent Voting for Preferred Candidate | Vote Cast For Preferred Candidate | Percent Black Population 2010 | Percent Black Population 2000 |
|--------|--------|--------------------|--------------------------------------|----------------------------------|------------------------------|------------------------------|
| Union | Republican | Democrat | 36.0 | 6,196 | 33 | 32 |
| Ashley | Republican | Democrat | 36.09 | 2,859 | 25.8 | 27.1 |
| Chicot | Democrat | Democrat | 60.74 | 2,649 | 54 | 54 |
| Drew | Republican | Democrat | 39.65 | 2,630 | 27.8 | 27.2 |
| Lincoln | Republican | Democrat | 38.24 | 1,425 | 29.9 | 32.9 |

| Jefferson | Democrat | Democrat | 63.80 | 17,470 | 55.1 | 49.6 |
| Pulaski | Democrat | Democrat | 54.74 | 87,248 | 35.0 | 31.9 |
| Desha | Democrat | Democrat | 55.27 | 2,443 | 47.8 | 46.3 |
| Arkansas | Republican | Democrat | 37.80 | 2,455 | 24.5 | 23.4 |
| Phillips | Democrat | Democrat | 65.60 | 5,202 | 63.1 | 59.05 |
| Monroe | Republican | Democrat | 49.01 | 1,583 | 40.9 | 38.8 |
| Lee | Democrat | Democrat | 61.54 | 2,107 | 55.3 | 57.2 |
| St. Francis | Democrat | Democrat | 53.72 | 4,910 | 51.9 | 49 |
| Crittenden | Democrat | Democrat | 56.75 | 9,487 | 51.2 | 47.1 |
| Cross | Republican | Democrat | 34.11 | 2,279 | 22.2 | 23.7 |

The solution to the racial gerrymandering in the present 1st Congressional District, is to adopt Chart 2 as the remedy. The goal is to keep communities of interests together while providing equal opportunity to Plaintiffs to elect their preferred candidate in the U.S. Congressional race in the 1st Congressional District as re-drawn herein.



3. **The extent of the jurisdiction's use of majority vote requirements, <u>unusually large electoral districts</u>, prohibitions on bullet voting, and other devices that tend to enhance the opportunity for voting discrimination;**

The congressional map of Arkansas is the best evidence of the configuration of each of the four congressional districts. At first blush, the map looks gerrymandered, ie, the **Fayetteville Finger** (District 4) and the **Central Circle** (District 2). **One-third of the state** is encompassed by the 1st Congressional District. It is irrefutable that the 1st Congressional District is **<u>unusually large</u>**. The political and economic interests of like-minded whites in the northeast part of the 1st Congressional District are diabolically opposed to the political and economic interests of the Plaintiffs who reside in the southeast section of the 1st Congressional District. The 1st Congressional District is the Poster Child of Vote Dilution through Submergence. **Defendants split part of Jefferson County and put it in the 1st Congressional District while the remainder of Jefferson County is in the 4th Congressional District.** This tactic diluted the African American vote in Jefferson County and effectively prevented Plaintiffs and all those similarly-situated, from electing their preferred candidate in either the 1st Congressional District or the 4th Congressional District. That one tactic by defendants, "killed two birds with the same stone".



4. **Whether minority candidates are denied access to the jurisdiction's candidate slating processes, if any;**

It is apropos to address restrictive voter identification laws, which enhances the opportunity for voting discrimination. These laws are intended to discourage minority voters from turning out to the polls to vote for the candidate of their choice, while disenfranchising others, including Blacks in Southeast Arkansas. These restrictive voter id laws have been stricken in states such as Texas and North Carolina. Yet, in 2018, this defendant, State of Arkansas, continues to enforce its

restrictive voter id laws. Defendant, Arkansas Legislature is turning back the hands of time, while intentionally discriminating against the minorities in Arkansas vis-à-vis restrictive voting laws. Visiting history is very important.

At first, only white men who owned land could vote in the United States. Black men were not granted the right to vote until 1870 with the adoption of the Fifteenth Amendment to the U.S. Constitution. Women were not granted the right to vote until the Nineteenth Amendment to the Constitution was adopted in 1919. The voting right was denied to persons younger than 21 years of age until the Twenty Sixth Amendment was adopted in 1971. Defendant Arkansas Legislature has a long and ugly history of denying access to the ballot based on wealth, race, sex and age. It should be noted that it was the Arkansas Legislature in Little Rock that passed legislation to run all of its free Blacks out of the state of Arkansas in 1859.

After the Fifteenth Amendment was ratified, Black people began voting in states where they had previously been enslaved. However, when Reconstruction ended, Black citizens were defrauded of the right to vote by various devices and schemes, such as the poll tax; economic intimidation; unconstitutional tests which required Black citizens to recite the provisions of the Constitution. In the South, Blacks were virtually disenfranchised. In Louisiana, the number of Blacks registered in 1896 was 130,344. In 1900, just 4 years later, there were only 5,320 Blacks on the registration books. What caused this phenomenon? The state re-wrote the suffrage provisions of its constitution.

Defendant, Arkansas Legislature enacted the restrictive voter identification laws to hinder people of color; citizens who are not white, not male, not wealthy; women, the poor, senior citizens, disabled persons, Blacks, Hispanics, Asians and young people, from voting in Arkansas. There is not one iota of evidence of one instance where someone tried to vote in an Arkansas election by pretending to be someone else. ( **See, Judge Wendell Griffen, Ugly Truth About Voter ID Laws, Little Rock Sun, Vol. 2 Number 29, Aug. 3-10, 2014).** Plaintiffs posit that these restrictive voter id laws should be stricken and defendants enjoined from enforcing these restrictive voter id laws in any 2018 elections.

**5. The extent to which the jurisdiction's minorities are discriminated against in socioeconomic areas, such as education, employment, and health;**

The African Americans in the 1st Congressional District continue to be discriminated against in all areas of everyday life. - including education, employment, healthcare and juvenile and criminal justice. They are **the Poster Children of Poverty**, including the Arkansas Delta.

 

Over the years, the courts have found violations of Section 2 when numerous challenges were made to redistricting maps involving **state legislative districts**. *See, e.g., Smith v. Clinton,* 687 F. Supp. 1310, 1311 (E.D. Ark. 1988) (three-judge court) *("Smith I")* (holding that "at-large election of representatives in this multimember structure so dilutes the voting strength of [B]lack residents of the district as virtually to guarantee that no [B]lack person will ever be elected State Representative in Crittenden County"); *Smith v. Clinton,* 687 F. Supp. 1361, 1363 (E.D. Ark. 1988) (three-judge court) *("Smith II"), aff'd memo.,* 488 U.S. 988 (1988) (ordering Board to implement Plaintiffs' plan providing for single-member majority-[B]lack district in Crittenden County with "a majority [B]lack population of 60.55% among residents of voting age" to "give [B]lacks a fair opportunity to elect the candidate of their choice to the Arkansas House of Representatives [("House")], and· help to eradicate the effect of the dual-member, at-large system on participation by [B]lacks in the political process"); *Jeffers I,* 730 F. Supp. at 198 (holding that the plaintiffs, 17 Black electors, "demonstrated a violation of their rights under federal law" because the 1981 apportionment plan only created five majority-minority districts-" one in the Senate and four in the House"-when "a total of 16 such districts, three in the Senate and 13 in the House, could have been created") ( footnote omitted); *Jeffers v. Clinton,* 756 F. Supp. 1195, 1198-1200 (E.D. Ark. 1990) *("Jeffers II")* (three-judge court), *aff'd memo.,* 498 U.S. 1019 (1991) (rejecting as legally

16

insufficient Board's proposed remedial plan creating a House district in Monroe and Phillips Counties with a [B]lack voting age population (BVAP) of 58 percent and a House district in Lee and St. Francis Counties with a BVAP of 56 percent and adopting plaintiffs' plans for those districts, with a BVAP of 63 percent and 64 percent, respectively, and also rejecting as legally insufficient Board's proposed remedial plan for a Senate district including portions of Crittenden, Cross, Lee, Phillips, and St. Francis Counties that had a BVAP of 55 percent and adopting Plaintiffs' plan, with a BVAP of 60.5 percent); *Jeffers II*, 756 F. Supp. at 1202 (opinion on reconsideration filed March 5, 1990) (granting Board's motion for reconsideration to modify the Senate district by "increas[ing] the ... BVAP... of this District from 61% to 62%" in order "to prevent two incumbent white senior Senators from being placed in the same district"); *Jeffers v. Tucker*, 847 F. Supp. 655, 660-62 (E.D. Ark. 1994) (three-judge court) (holding that [B]lack voters failed to satisfy ***Gingles*** compactness precondition for vote-dilution claim regarding Arkansas' state legislative apportionment plan for both the House and Senate because the [B]lack population was too widely dispersed for there to be a holding that the Board violated Section 2 by refusing to draw additional House and Senate districts as the [B]lack voters requested). At the liability stage of the *Jeffers* litigation, the court did "not hold that the law requires the creation of any particular number of majority-[B]lack districts." *Jeffers I*, 730 F. Supp. at 217. Instead, the court found "how many such districts can be created" and learned "that their lines can be drawn so as to make them reasonably compact and contiguous." *id.* Thus, the court articulated "a sort of presumption that any plan adopted should contain that number of majority-[B]lack districts." *id.*

Plaintiffs could not find a reported case where challenges were made to the **congressional districting plans** of Arkansas since the 2000 census.

### 6. Whether overt or subtle racial appeals in campaigns exist

The evidence shows overt racial animus by then-governor Beebe in his conversation with Mrs. Annie Abrams regarding whether the Democratic Party would support Joyce Elliott, Black African American female, in her bid for U.S. Congress in Congressional District 2. (See Affidavit – Mrs. Abrams). This is crucial evidence on the issue of **white bloc-voting**. White Democrats voted along race lines and propelled the white Republican to victory, as their preferred candidate, regardless of his qualifications, lack of experience or political party. The highest Democrat in the state (the governor) tacitly advocated for a **white bloc vote** in the 2nd Congressional District race involving Joyce Elliott.

State Senator Joyce Elliott, a faithful and loyal, hard-working Democrat over the years, was abandoned by her own party because of her race, African American Black and her fellow white Democrats voted for the white Republican over her.

### 7. The extent to which minority candidates have won elections;

By information, research and belief, no African American has ever been elected to the U.S. Congress from the State of Arkansas since Arkansas became a state. Today, we see the evidence of the reasons why and this phenomenon will continue unabated for the next 100 years, if this Court does not enjoin the unconstitutional activities of defendants, jointly and severally, in their official capacities.

### 8. The degree that elected officials are unresponsive to the concerns of the minority group;

The elected officials, defendants herein, have not been responsive at all to the concerns sent to them on numerous occasions, by email, pleading with them to at least look at the proposed re-drawn congressional district maps. No one responded. (See Affidavit – Dr. Julius Larry). Trips were made to defendant Hutchison's office regarding whether or not the Governor had an opportunity to review the proposed congressional redistricting maps. After several trips, a liaison from the Governor's office met with Plaintiff Larry in the hallway and discussed the problem. There was never any feedback or follow-up from any of the defendants, or their agents or employees. (Affidavit – Dr. Larry). Plaintiff Larry called Congressman French Hill's office and explained the problem. No one responded one way or another and no one called with a solution to the racial gerrymandering problem in the 1st Congressional District. It is this failure to respond that necessitated the present action.

.

.

### 9.  Whether the policy justification for the challenged law is tenuous

> There is no policy justification or legitimate explanation for the racial gerrymandering of the 1st Congressional District.  Even if defendants argue that their gerrymandering was not for racial purposes, but partisan political reasons, Plaintiffs plead in the alternative that partisan gerrymandering of 1st Congressional District is unconstitutional and a violation of Section 2 of the Voting Rights Act. Under the **"results test",** the racial discrimination is the same.

In **_Thornburg v. Gingles_**, 478 U.S. 30 (1986), a unanimous United States Supreme Court found that **"the legacy of official discrimination ... acted in concert with the multimember districting scheme to impair the ability of ... cohesive groups of Black voters to participate equally in the political process and to elect candidates of their choice."** The ruling invalidated districts of the North Carolina General Assembly and led to more single-member districts in state legislatures.

Under the **_Gingles_** test, Plaintiffs must show the existence of three preconditions:

1. **The racial or language minority group "is sufficiently numerous and compact to form a majority in a single-member district";**
2. **The minority group is "politically cohesive" (meaning its members tend to vote similarly); and**
3. **The "majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate"**

The first precondition is known as the **"compactness"** requirement and concerns whether a majority-minority district can be created. The second and third preconditions are collectively known as the **"racially polarized voting"** or **"racial bloc voting"** requirement, and they concern whether the voting patterns of the different racial groups are different from each other. If a Plaintiff proves these preconditions exist, then the Plaintiff must additionally show, using the remaining **Senate Factors** and other evidence, that under the **"totality of the circumstances",** the jurisdiction's redistricting plan or use of at-large or multimember elections diminishes the ability of the minority group to elect candidates of its choice.

13. Plaintiffs repeat and reallege paragraphs 1 through 12 as if fully set out herein and assert that they affirmatively meet the requirements of the **Gingles** test. When this Court considers the history, **Senate Factors** and the **"totality of the circumstances"**, the 1st Congressional District, as presently drawn, should be stricken and defendants enjoined from conducting any primaries for congressional districts or elections for congressional districts until this racial gerrymandering matter made the basis of this action is corrected.

**Gingles Test**

1. **The racial or language minority group "is sufficiently numerous and compact to form a majority in a single-member district";**

   The proposed re-drawn 1st Congressional District map evidences **numerosity** and **compactness** to form a single-member district.



∞ 716,000 people    11/4/17

2.   **The minority group is "politically cohesive" (meaning its members tend to vote similarly);**

Once upon a time, all Blacks were Republicans of the Party of Lincoln.  But, after the Great Depression and the Franklin D. Roosevelt era, Blacks generally tended to vote Democratic.  This is still true today for the most part, although there are many Black Republicans,   including Plaintiff Larry. In the proposed new 1st Congressional District, African Americans would have the best opportunity to elect to the U.S. Congress, their preferred candidate. (See, **"The Africans Have Taken Arkansas": Political Activities of African-American Members of the Arkansas Legislature, 1868-73 --** Christopher Warren Branam,  University of Arkansas, Fayetteville).

3.  **The "majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate"**

Although defendants may argue that then-governor Beebe's conversation with Mrs. Abrams was just an isolated incident, the best evidence is Chart 1 showing the results of the 2012 congressional election in the 1st Congressional District.  The "**results test**" is controlling.  (Data from defendant Secretary of State).

**TABLE 1**

**Arkansas State General Election**
**November 6, 2012**

Website last updated 11/21/2012 11:00:37 AM CST

Registered Voters:  1,618,320

Ballots Cast:    1,078,548

Voter Turnout:    66.65 %

Counties Partially Reported:    0 of 75

Counties Completely Reported:   75 of 75

Counties Percent Reported:   100.00 %

## U.S. Congressional District 1

| COUNTY | WINNER | Preferred Candidate | Percent Voting For Preferred Candidate | Votes Cast For Preferred Candidate | Percent Black Population |
|---|---|---|---|---|---|
| Greene | Republican | Democrat | 36.28 | 4,843 | .6 |
| Clay | Republican | Democrat | 37.76 | 1,884 | .3 |
| Randolph | Republican | Democrat | 38.11 | 2,227 | .7 |
| Fulton | Republican | Democrat | 33.21 | 1,689 | .3 |
| Baxter | Republican | Democrat | 26.47 | 5,011 | .2 |
| Izard | Republican | Democrat | 33.22 | 1,727 | 1.3 |
| Sharp | Republican | Democrat | 33.10 | 2,378 | .5 |
| Lawrence | Republican | Democrat | 39.90 | 2,199 | .8 |
| Craighead | Republican | Democrat | 39.37 | 12,400 | 13.1 |
| Searcy | Republican | Democrat | 21.61 | 724 | .1 |
| Stone | Republican | Democrat | 29.59 | 1,550 | .1 |
| Cleburne | Republican | Democrat | 24.85 | 2,821 | .3 |
| Independence | Republican | Democrat | 29.45 | 3,572 | 2 |
| Jackson | Republican | Democrat | 44.30 | 2,312 | 16.7 |

| | | | | | |
|---|---|---|---|---|---|
| *Poinsett* | *Republican* | *Democrat* | *40.76* | *3,056* | *7.2* |
| *Mississippi* | *Democrat* | *Democrat* | *47.89* | *6,049* | *34* |
| *Woodruff* | *Democrat* | *Democrat* | *51.33* | *1,351* | *27.5* |
| *Prairie* | *Republican* | *Democrat* | *33.96* | *1,042* | *12.2* |
| *Lonoke* | *Republican* | *Democrat* | *25.54* | *6,049* | *6* |
| *Cross* | *Republican* | *Democrat* | *37.21* | *2,402* | *22.2* |
| *Crittenden* | *Democrat* | *Democrat* | *53.77* | *8,538* | *51.2* |
| *St. Francis* | *Democrat* | *Democrat* | *57.68* | *4,647* | *51.9* |
| *Lee* | *Democrat* | *Democrat* | *62.20* | *2,055* | *55.3* |
| *Monroe* | *Democrat* | *Democrat* | *51.20* | *1,574* | *40.9* |
| *Phillips* | *Democrat* | *Democrat* | *61.90* | *4,642* | *63.1* |
| *Arkansas* | *Republican* | *Democrat* | *39.71* | *2,510* | *24.5* |
| *Desha* | *Democrat* | *Democrat* | *62.47* | *2,625* | *41.8* |
| *Jefferson* | *Democrat* | *Democrat* | *67.15* | *\*\*\*327* | *55.1* |
| *Lincoln* | *Republican* | *Democrat* | *45.66* | *1,672* | *29.9* |
| *Chicot* | *Democrat* | *Democrat* | *64.07* | *2,757* | *54.1* |

The evidence is overwhelming that the white voters in 20 of the unusually large 30-county 1st Congressional District, got their preferred candidate elected. The remaining 10 Democratic counties, where the Plaintiffs reside, showed their preferred candidate winning in those counties. However, due to **vote dilution and submergence**, Plaintiffs' preferred candidate could not and will never win under the present congressional district configuration. When the Court considers the **totality of the circumstances** and all of the evidence, including the **Senate Factors**, it is clear

.

· that the defendants have violated Section 2 of the Voting Rights Act and the remedy is a new 1st

Congressional district map as proposed herein.

**CHART 2**

## New Proposed U.S. Congressional District 1

### (Based on 2012 Presidential Election Results)

| COUNTY | WINNER | Preferred Candidate | Percent Voting for Preferred Candidate | Votes Cast For Preferred Candidate | Percent Black Population 2010 | Percent Black Population 2000 |
|--------|--------|---------------------|-----------------------------------------|-------------------------------------|-------------------------------|-------------------------------|
| Union | Republican | Democrat | 36.0 | 6,196 | 33 | 32 |
| Ashley | Republican | Democrat | 36.09 | 2,859 | 25.8 | 27.1 |
| Chicot | Democrat | Democrat | 60.74 | 2,649 | 54 | 54 |
| Drew | Republican | Democrat | 39.65 | 2,630 | 27.8 | 27.2 |
| Lincoln | Republican | Democrat | 38.24 | 1,425 | 29.9 | 32.9 |
| Jefferson | Democrat | Democrat | 63.80 | 17,470 | 55.1 | 49.6 |
| Pulaski | Democrat | Democrat | 54.74 | 87,248 | 35.0 | 31.9 |
| Desha | Democrat | Democrat | 55.27 | 2,443 | 47.8 | 46.3 |
| Arkansas | Republican | Democrat | 37.80 | 2,455 | 24.5 | 23.4 |
| Phillips | Democrat | Democrat | 65.60 | 5,202 | 63.1 | 59.05 |
| Monroe | Republican | Democrat | 49.01 | 1,583 | 40.9 | 38.8 |
| Lee | Democrat | Democrat | 61.54 | 2,107 | 55.3 | 57.2 |
| St. Francis | Democrat | Democrat | 53.72 | 4,910 | 51.9 | 49 |
| Crittenden | Democrat | Democrat | 56.75 | 9,487 | 51.2 | 47.1 |
| Cross | Republican | Democrat | 34.11 | 2,279 | 22.2 | 23.7 |

.

.

**First Cause of Action**

15.  Defendant, Arkansas Legislature   adopted the existing Congressional district plan which

violates Section 2 of the Voting Rights Act, as amended, 42 U. S. C. § 1973. The existing plan

denies and  abridges the Plaintiffs' right to vote on account of their race and color, by diluting their

voting strength as African American Black citizens in Arkansas. The plan does not afford Plaintiffs

an equal opportunity to participate in the political process and to elect U.S. Congresspersons  of

their choice and denies Plaintiffs the right to vote in elections without discrimination on account

of their race and color, in violation of 42 U.S.C. § 1973.

**Second Cause of Action**

16.  Plaintiffs  repeat and reallege paragraphs 1 through 15  as if fully set out herein and assert that

the existing congressional  plan was adopted by defendant,  Arkansas Legislature with an intent to

deny,  abridge,  submerge  and nullify  the right of Black  African  American  citizens  residing  in

Southeastern  Arkansas,  to vote on account of their race and color. This intentional discrimination

is in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution and

42 U. S. C. § 1983.

**BASIS FOR EQUITABLE RELIEF**

18.  Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged in

this Complaint and this suit for Declaratory Judgment and Injunctive relief is their only means of

securing adequate redress from all of the defendants' unlawful practices.

.

19.  Plaintiffs will continue to suffer irreparable injury from all of the defendants' intentional acts, policies, and practices set forth herein unless enjoined by this Court, including enjoining any and all elections in the 1st Congressional District..


**ATTORNEYS FEES**

20.  In accordance with 42 U. S. C. § 1973-1(e) and 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable attorneys' fees, expenses and costs, including expert witnesses' fees.


**PRAYER FOR RELIEF**

21.  Plaintiffs respectfully requests the Court to grant the following relief:

a.    Assume jurisdiction and request the convening of a three-judge court under 28 U.S.C. § 2284;

b.    A declaratory judgment that the actions of the defendants in racial gerrymandering in the 1st Congressional District  of Arkansas violate the rights of the Plaintiffs,  as protected by Section 2 of the Voting Rights Act of 1965, as amended,  42 U. S. C. § 1973; and the Fourteenth and Fifteenth Amendments to the U.S. Constitution;

c.    A temporary restraining order instanter curtailing any elections in the congressional districts;

d.    A permanent injunction enjoining and forbidding the use of the state Congressional district plan adopted by defendants,  as presently drawn;

e.    A permanent injunction requiring the defendants, their successors in office, agents, employees, attorneys, and those persons acting in concert with them or at their discretion or direction, to develop and adopt a redistricting plan for the 1st Congressional District and adjacent

districts that does not dilute African-American voting strength for the office of U.S. Representative;

     f. An order retaining jurisdiction over this matter until all defendants have complied with all orders and mandates of this Court;

     g. An order cancelling the Spring Congressional primaries until a new congressional district map is adopted and approved by this Court;

     h. An order requiring defendants to pay all of Plaintiffs' costs, including reasonable attorneys' fees.

     i. Such other and further relief as the Court may deem just and proper such that Justice prevails.

Respectfully submitted,

Julius J. Larry III, DDS;JD;MPH — Pro Se
2615 W. 12th Street
Little Rock, AR 72202
(501) 502-6121
(832) 384-6908- Cell
dr.juliusjlarry@yahoo.com
publisher@lrsuntimes.com

.

.

**CERTIFICATE OF SERVICE**

This is to certify that on this 9th day of February, 2018, a true and correct copy of the foregoing

instrument was served on all defendants by United States mail, certified, return receipt requested.

Julius J. Larry III



Congressional Districts in Arkansas: Since 2013
map: nationalmap.gov; Small Scale GIS Project

Ex. A

African American Population Map - Encyclopedia of Arkansas



Map showing the percentage of the population in each county in Arkansas that is African American. Percentages in red indicate that the county has a higher percentage of African Americans than the statewide average of 15.4 percent. All statistics are from Census Bureau figures.

SEE RELATED ENTRIES

© 2017 The Central Arkansas Library System – All Rights Reserved

≈ 716,000 people

Map created by Mike Backhaus

New 1st Congressional District (Redrawn) Praying for Justice

11/4/17

Ex. B



http://www.encyclopediaofarkansas.net/encyclopedia/media-detail.aspx?mediaID=7325

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN (Little Rock) DIVISION

| | | | |
|---|---|---|---|
| DR. JULIUS J. LARRY III, Individually | § | | |
| And in his Official Capacity as Publisher – | | | |
| The Little Rock Sun Community | § | | |
| Newspaper, and on behalf of all other | | | |
| Similarly-situated African Americans | § | | |
| Residing in the Southeast Quadrant of | | | |
| the State of Arkansas | | | |
| | § | | |
| PLAINTIFFS, | | | |
| | § | | |
| VS. | § | CASE NUMBER: _____ | |
| | § | | |
| STATE OF ARKANSAS;  ASA | | | |
| HUTCHINSON, in his Official | | | |
| Capacity as Governor of the State of | § | | |
| Arkansas; LESLIE RUTLEDGE, in | | | |
| her Official Capacity as Attorney | § | | |
| General of the State of Arkansas; MARK | | | |
| MARTIN, in his Official Capacity as | § | | |
| Arkansas Secretary of State and the | | | |
| Arkansas Legislature, in their Official | | | |
| Capacities | § | | |
| | | | |
| DEFENDANTS. | | | |

STATE OF ARKANSAS  §§

§§

COUNTY OF PULASKI  §§


**AFFIDAVIT OF ANNIE McDANIEL ABRAMS  IN SUPPORT OF CONGRESSIONAL
REDISTRICTING  IN ARKANSAS -- 2018**

**Before Me the Undersigned Notary Public,** personally appeared Annie McDaniel Abrams, known to me personally, and after being duly sworn, deposed and stated the following**:**

"My name is Annie McDaniel Abrams. I am a resident of Little Rock, Pulaski County, Arkansas; registered voter and lifelong Democrat. I am an Oral Historian, Educator and Civil Rights Activist for over 65 years. My home is a History Museum. My rich personal library of books, documents and directories are used as a free reference system for many researchers examining Arkansas history. I have spoken before hundreds of audiences in schools, churches and conferences.

I was one of the first African Americans to host a public access channel in the early days of cable tv in Little Rock. I used my show, **"The State Press in Review",** as a platform to Enlighten and Educate my audience. The show was in production for four years. Hundreds of candidates for public office have sought my advice and have requested my endorsement. I have actively served on campaign committees and helped to elect many public servants at all levels of government in Arkansas. My beliefs and commitment for fighting for Justice, Life, and Liberty for all people are respected by my family, friends, associates, allies and even my opponents.

I have worked at the national and international level for over 30 years. In 1978, I was selected to represent the National Board of the YWCA of the U.S.A. at the **World Conference to Combat Racism and Racial Discrimination,** in Geneva, Switzerland. After leaving the conference, I became a local fixture at any event focused on eliminating class disparities in Arkansas. I served as a Commissioner for the Fair Housing Commission and on the Board of Directors for Our House. I have been directly involved in the desegregation and integration of Little Rock public schools.

I know State Senator Joyce Elliott very well. I have known her many years. Specifically, I remember when Joyce Elliott ran for the U.S. House of Representatives in the 2nd Congressional District. She had a Republican opponent, Tom Griffin, a political novice. African Americans preferred Joyce Elliot. We had a Democratic governor at the time – Governor Beebe.

I asked Governor Beebe if he would help us get Joyce elected to Congress. He replied**, "Arkansas does not have but 4 eligible seats due to the population and y'all don't deserve to have one of those four".** As a result, white Democrats supported the white Republican over Joyce Elliott, who is Black. Tom Griffin, the white Republican won over Joyce. Joyce Elliott was a faithful, loyal and hard-working, experienced Democrat, who held offices in the Democratic Party. To my knowledge, no African American has ever been elected to Congress from the State of Arkansas since Arkansas became a State."

Further Affiant Sayeth Not.

ANNIE McDANIEL ABRAMS

SUBSCRIBED AND SWORN TO this _07th_ day of February, 2018, witnesseth my Hand and Seal of Office.

EMMA E. RHODES
NOTARY PUBLIC  ARKANSAS
PULASKI COUNTY
My Commission Expires: 1-1-2021
My Commission Number: 12380137

NOTARY PUBLIC

My Commission expires:

01-01-2021

2

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN (Little Rock) DIVISION

| | |
|---|---|
| DR. JULIUS J. LARRY III, Individually §<br>And in his Official Capacity as Publisher –<br>The Little Rock Sun Community          §<br> Newspaper, and on behalf of all other<br>Similarly-situated African Americans   §<br>Residing in the Southeast Quadrant of<br>the State of Arkansas | |
| | § |
| PLAINTIFFS, | |
| | § |
| VS. | §          CASE NUMBER: _____ |
| | § |
| STATE OF ARKANSAS;  ASA<br>HUTCHINSON, in his Official<br>Capacity as Governor of the State of   §<br>Arkansas; LESLIE RUTLEDGE, in<br>her Official Capacity as Attorney       §<br>General of the State of Arkansas; MARK<br>MARTIN, in his Official Capacity as    §<br>Arkansas Secretary of State and the<br>Arkansas Legislature, in their Official<br> Capacities                            § | |
| DEFENDANTS. | |

 STATE OF ARKANSAS  §§

                                §§

COUNTY OF PULASKI  §§


**AFFIDAVIT IN SUPPORT OF REQUEST FOR THREE JUDGE PANEL PURSUANT 42
U.S.C. § 2284**

**Before Me the Undersigned Notary Public,** personally appeared Dr. Julius J. Larry III, known to me personally and after being duly sworn, stated as follows:

"My name is Julius James Henry Edward Lovelace Larry III. I am 68 years old and a resident of Pulaski County and registered voter. I graduated Savannah State College (now University), Savannah, GA, magna cum laude, with a BS degree in Chemistry, in 1975. I graduated Meharry Medical College -School of Dentistry, Nashville, TN in 1978, with a DDS degree, in three and one-half years. I graduated Thurgood Marshall School of Law – Texas Southern University, Houston, TX, magna cum laude in 1984. Also, I graduated University of North Texas Health Science Center at Fort Worth, Ft. Worth, TX in 2008, with a Master of Public Health (MPH) degree.

I practiced law in Houston, TX as a Civil Rights Attorney, where I was Board-certified in Forensic Medicine and a Diplomate of the American College of Forensic Examiners.

When I changed my residency from Houston, TX to Little Rock, AR, I was immediately met by voting registration requirements that were different from Texas vis-à-vis identification required, including my passport. When I applied for an Arkansas driver's license, another set of identification requirements were met – all restrictive.

I publish the **Little Rock Sun Community Newspaper,** the only Black-owned weekly in AR, which is distributed statewide, with a weekly circulation of 50,000 and 500,000+ readers. The digital website is: www.lrsuntimes.com. In the capacity as Publisher and in furtherance of the newspaper's mission to work for Racial Justice, I met with Mrs. Annie Abrams at her house. She is an Historian, Educator and Civil Rights Activist for over 65 years. She told me the history of how Blacks in Arkansas could never elect one of their own to the U.S. Congress regardless of voter turnout.

When I inquired as to why there had never been an African American Black elected to the U.S. Congress since AR became a state, she did not know the reason, even though Black voter turnouts have been very high, especially during the Presidential election for President Obama.

This prompted me to look at the Congressional districting map. When I first saw the present congressional district map, from experience and training, I could see a convoluted, gerrymandered system. When I reviewed the election results of the 2010 Congressional race in the 1st Congressional district, I knew immediately that something was wrong in the 1st Congressional District. First of all, it is unusually large, covering 1/3 of the State of Arkansas and encompassing 30 counties. The state has 75 counties, so almost ½ of the counties are in the 1st Congressional District.

A study of the voting patterns in the 1st Congressional district showed Black vote dilution. I checked the population of each county in the state and re-drew the entire congressional districting map for fundamental fairness. I sent my findings and drawings to Governor Asa Hutchinson and many members of the Arkansas Legislature, including State Senator, Joyce Elliot and Representative Fred Allen. I sent emails to Congressman French Hill because his 2nd Congressional District, the Circle, would be affected under the proposed re-drawn plan.

2

No one responded. I made several trips to the governor's office. I delivered hard copies of the re-drawn congressional maps to the governor's Executive Administrative Assistant, who placed the documents in the governor's "To Do" file. I made several follow-up trips to the governor's office after there was no response. On the last occasion, I delivered the governor his copy of the Little Rock Sun and inquired as to whether the governor had had an opportunity to review the racial gerrymandering in the 1st Congressional District. These trips were futile and no response was ever received.

Finally, I insisted on talking with someone who could at least review the information I submitted for consideration on re-districting. A liaison from the governor's office met with me in the hallway outside of the governor's office and we thoroughly discussed the problem and the solution, in light of the history that no African American had been elected to Congress since Arkansas became a state. He said that he understood the problem, but I never heard from him again.

Committed and undaunted, I went to see Dale Charles, president of the Arkansas State Conference-NAACP. Dale Charles is also president of the local Little Rock branch. He informed me that he had tried to do something about the problem for years, in vain. I called Congressman French Hill's office and explained the problem. His office called me back to get a better understanding of the problem of racial gerrymandering in the 1st Congressional District. There was no further contact from any official regarding fixing the problem.

I called the attorney who handled the Jeffers case. His office did not return my call. So, the only option I had left was to file the instant suit seeking declaratory and injunctive relief.

My mother, Mrs. Angel Maella Vanderbilt Tillman Larry, was the Family Historian. She transitioned last year at the age of 102 and was in good mental health. My youngest sister, Geraldine Larry Williams, researched the family history for her college thesis since she was a History major. The Larrys were free men, some of whom fought in the War of 1812 and were related to Peter Caulder. After the war, they settled in Arkansas close to Fort Smith, before Arkansas became a state. They owned land and were good citizens and veterans. However, in 1859, the Arkansas General Assembly in Little Rock, passed a law to make them slaves if they did not leave the state by a deadline certain.

Many free Blacks left Arkansas and many went east to Helena and the surrounding area and lived with the Black Mississippi Choctaw. The Larry's settled in Helena, Arkansas, where they still live today and run the Larry Farm. James Larry, Edward Larry, Curtis Larry and their first cousin, WL Lovelace, fought and won the Battle of Helena on July 4, 1863, which was a great Union victory. Helena was never a part of the Confederacy. Many Black slaves in the area took the opportunity to become free by being "contraband" with the Union Army. They joined the Union Army.

The Larry's served in an all-Black Regiment that defended Helena in the trench lines from the "mutinous attacks of the traitors from Little Rock". They served in the 2nd Arkansas Infantry Regiment. So, the African Americans in the southeastern part of Arkansas, commonly called the Delta, are the True American Patriots who were on the right side of history, although nothing commemorates their Loyalty to the Union or their Heroism at the Battle of Helena on July 4, 1863. It is only a footnote in Confederate history. I visit Helena-West Helena often delivering the Little

Rock Sun. All I see are monuments and tributes to the Confederacy. But, the Confederate Cemetery tells the true story of who lost. It is upon this historical background that the disenfranchisement of the African American voters in the Delta is taking place today.

No one is listening or doing anything to correct racial gerrymandering in the 1st Congressional District.


Further affiant sayeth not.

Julius J. Larry III

SWORN AND SUBSCRIBED to this ___ day of February, 2018, witnessed my Hand and Seal of Office.

NOTARY PUBLIC


My Commission expires:

_06 - 25 - 2025_____

4