## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN (Little Rock) DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 0 3 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

| | | |
|---|---|---|
| DR. JULIUS J. LARRY III, Individually And in his Official Capacity as Publisher – The Little Rock Sun Community Newspaper; ANNIE MABEL ABRAMS; REVEREND REGINALD J. HAMPTON; MARTHA DIXON; DOROTHY JEFFERSON; SHIRLEY D. LARRY individually and on behalf Similarly-situated African Americans Residing in the Southeast Quadrant of the State of Arkansas | § § § § § § § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **VS.** | § | **CASE NUMBER: 4:18-cv-116-KGB** |
| | § | |
| STATE OF ARKANSAS; ASA HUTCHINSON, in his Official Capacity as Governor of the State of Arkansas; LESLIE RUTLEDGE, in her Official Capacity as Attorney General of the State of Arkansas; MARK MARTIN, in his Official Capacity as Arkansas Secretary of State and the Arkansas Legislature, in their Official Capacities | § § § § | |
| **DEFENDANTS.** | | |

## PLAINTIFF LARRY'S MOTION FOR APPOINTMENT OF SPECIAL MASTER TO REFINE BORDERS OF MAJORITY-MINORITY COALITION DISTRICT CD1 WITH MEMORANDUM OF POINTS AND AUTHORITIES

**TO THE HONORABLE PANEL:**

1

**COMES NOW,** Plaintiff, Dr. Julius J. Larry III, individually and on behalf of all other similarly situated African Americans, Hispanics and other minorities who are registered voters and residents of Arkansas and reside in the counties included in Plaintiffs' Proposed **majority-minority coalition district (new CD1),** and files this Motion for Appointment of a Special Master as follows:

1. Plaintiff Larry sent a Settlement Offer to defendants after the Supreme Court's decision in <u>Abbott v. Perez.</u> The gravamen of the offer was to request the Governor to call a Special Session of the Arkansas Legislature immediately, to adopt and approve the only **majority-minority coalition district** that can be drawn, according to the experts at Redistricting Project.



2. The Plaintiffs' proffered new CD1 is the only one that can be drawn and the Legislature cannot draw any other one. So, the prudent and proper thing for defendants to do was to adopt and approve the new CD1, where **Chintan Desai,** a minority, is the Democratic candidate for 1st Congressional District, after having won the Democratic Primary. He is the candidate of choice of Plaintiffs, including Plaintiff Larry.

**3.** It would be an exercise in futility for defendants to continue to delay the inevitable. Plaintiff Larry sent the following email to defendants' attorneys.

Julius Larry <dr.juliusjlarry@aol.com>

    **Vincent France,kellylawfedecf@aol.com,mi.fincher@yahoo.com,Simmons Smith,countrymack@aol.comand 6 more...**

Jul 25 at 12:46 AM

**Messrs. France, Kelly and Fincher:**

**Recently, I sent you a Settlement Offer to advise your clients, the Governor, AG and Sec. of State, to adopt the Plaintiffs' majority-minority coalition district as drawn by the Redistricting Project and presented to the Court as the Plaintiffs' proposed new Congressional District 1.**

**What did your clients decide regarding the adoption of the majority-minority coalition district? The November election is imminent. There is still time for the Governor, acting in good faith, to call a Special Session to adopt the Plaintiffs' redrawn map of the 1st Congressional District.**

**If I do not hear from you by close of business August 1, 2018, I will assume that your clients refuse to adopt a majority-minority coalition district, acting in bad faith and with discriminatory intent, to continue the status quo of disenfranchisement of African Americans and Hispanics in Southeast Arkansas and refusing to allow them an equal opportunity to elect Chintan Desai, the candidate of their choice, for US Congress from CD1 in November 2018.**

**Also, please provide available dates for the depositions of the Governor, Attorney General; Secretary of State and State Senator Joyce Elliott.**

**Thank you very much.**

**Dr. Julius J. Larry III**

4. As a direct result of defendants' failure to adopt Plaintiffs' new CD1, this Motion to Appoint a Special Master to refine the borders of new CD1 so that the Arkansas Legislature will have time to adopt and approve the map redrawn by the Special Master before the November 2018 Congressional elections is necessary. Defendants' strategy is to delay any decisions until after the November election and continue to delay until after the 2020 census. For over 100 years, defendants have delayed justice for minorities in Arkansas. The time is now to correct history's error of disenfranchisement of Blacks in the Arkansas Delta.

3

5. Plaintiff Larry respectfully requests the Panel to take judicial notice of the historical facts (Senate Factors) in Smith v. Clinton, 687 F. Supp. 1310 (E.D.Ark. 1988); Perkins v. City of West Helena, 675 F.2d 201, 211 (8th Cir. 1988); Jeffers 1 and Jeffers II. In Perkins, the Court stated: **"We do not believe that this history of discrimination, which affects the exercise of the right to vote in all elections under state law, must be proved anew in each case under the Voting Rights Act".** The defendants should stipulate to the historical facts without requiring further proof of the Senate Factors.

6. Likewise, Plaintiff Larry informs the Panel that the **Requests for Admissions to Defendants** were never answered and the same are deemed admitted for all purposes. (See Ex. A--**Plaintiff's First Request for Admissions to Defendants**). On May 3, 2018, **Plaintiff's Request for Admissions to Defendants** were served on defendants by and through their attorneys of record. See Certificate of Service.  To date, defendants have never responded to the Requests for Admissions. **Defendants have admitted a violation of §2 of the Voting Rights Act.**

7. Section 2 of the Voting Rights Act of 1965 prohibits any jurisdiction from implementing a "voting qualification or prerequisite to voting, or standard, practice, or procedure ... in a manner which results in a denial or abridgement of the right ... to vote on account of race," color, or language minority status. The Supreme Court has allowed private plaintiffs, such as Plaintiff Larry, to sue to enforce this prohibition. In City of Mobile v. Bolden (1980), the Supreme Court held that, as originally enacted in 1965, Section 2 simply restated the Fifteenth Amendment and thus prohibited only those voting laws that were intentionally enacted or maintained for a discriminatory purpose. Senate Judiciary

4

8. Committee Chairman, Strom Thurmond and House Speaker, Tip O'Neill responded by passing an amendment to the Voting Rights Act, and President Ronald Reagan signed it into law on June 29, 1982. Congress's amended Section 2 to create a **"results" test**, which prohibits any voting law that has a discriminatory effect, irrespective of whether the law was intentionally enacted or maintained for a discriminatory purpose. The 1982 amendments provided that the results test does not guarantee protected minorities a right to proportional representation. Plaintiffs herein are not seeking "proportional representation", but an equal opportunity to elect their preferred candidate to the U.S. Congress.

9. When determining whether a jurisdiction's election law violates this general prohibition, courts have relied on factors enumerated in the Senate Judiciary Committee report associated with the 1982 amendments ("Senate Factors"), including:

**1. The history of official discrimination in the jurisdiction that affects the right to vote;**

**2. The degree to which voting in the jurisdiction is racially polarized;**

**3. The extent of the jurisdiction's use of majority vote requirements, unusually large electoral districts, prohibitions on bullet voting, and other devices that tend to enhance the opportunity for voting discrimination;**

**4. Whether minority candidates are denied access to the jurisdiction's candidate slating processes, if any;**

**5. The extent to which the jurisdiction's minorities are discriminated against in socioeconomic areas, such as education, employment, and health;**

**6. Whether overt or subtle racial appeals in campaigns exist;**

**7. The extent to which minority candidates have won elections;**

**8. The degree that elected officials are unresponsive to the concerns of the minority group; and**

**9. Whether the policy justification for the challenged law is tenuous.**

The report indicates that not all or a majority of these factors need to exist for an electoral device to result in discrimination, and it also indicates that this list is not exhaustive, allowing courts to consider additional evidence at their discretion.

## A. Senate Factors

### 1. History of Official Discrimination that affects the right to vote

Arkansas has a long and violent history of discrimination in voting targeted against its African American communities in the state. Free Blacks were run out of the state of Arkansas in 1859 when the Arkansas General Assembly passed a new law to make them slaves if they did not leave. Many free Blacks were Army veterans of the War of 1812, who settled in Arkansas before it was a state; including Peter Caulder, James Larry, William Tillman, Henry Larry, Ben Turner and many others. Many free Blacks left Arkansas, while others moved east to the Mississippi River

to live with the Black Mississippi Choctaw. The land owned by the free Blacks was taken by whites, under color of law, including Caulder's Bluff at Fort Smith.

The Larry family settled in Helena-West Helena after Edward Larry, W.L. Lovelace, James Larry and Curtis Larry served in the all-Black 2nd Arkansas Infantry Regiment. which won the Battle of Helena on July 4, 1863. However, this great Union victory by its Black soldiers went unnoticed

6

in history. Helena and its Black residents were never a part of the Confederacy, like the rest of Arkansas.

Today, they are the poorest of the poor, residing in the "'Arkansas Delta" and disenfranchised by defendants in Little Rock. For them, democracy has been nullified in the 1st Congressional District by defendants herein.

## 2. Racially polarized voting in 1st Congressional District

Plaintiffs respectfully request the Court to take judicial notice of the factual findings and holdings in <u>Jeffers v. Clinton</u>, 730 F.Supp 196, 208-209 (E.D. Ark. 1989), where the court found that elections in eastern Arkansas were racially polarized. The problem in the 1st Congressional District is more egregious in 2018 than in 1989. See Table 1- Request for Three Judge Panel and the same is hereby incorporated by reference. (Data from defendant, Secretary of State of Arkansas).

Noted Oral Historian, retired Educator and Civil Rights activist for over 65 years, Mrs. Annie McDaniel Abrams explained, in her Affidavit attached herein as Ex B, the racial polarization and bloc voting of whites when Joyce Elliott, a prominent Black Democratic Arkansas legislator, ran for U.S. Congress from the 2nd Congressional District against Tom Griffin, a white Republican political novice who had never held any elected office. Then-governor Beebe stated that neither he nor the Democratic Party was going to help Joyce Elliott be elected to the 2nd Congressional District **"because Arkansas did not have but four eligible seats due to population and y'all don't deserve to have one of those four seats".** (See - Affidavit - Mrs. Annie Abrams).

As a result of racial animus and white bloc voting, Tom Griffin won over Joyce Elliott because

7

white Democrats voted for the white Republican along racial lines, rather than vote for a Democrat who happened to be a Black female with many years' experience in government and education. Joyce Elliott was a very loyal and dedicated member of the Democratic Party and a long-term officer in the Democratic Party.

Most egregiously, by information and belief, neither the Republican Party nor the Democratic Party has ever supported an African American candidate for the U.S. Congress from the 1st Congressional District of Arkansas or any other congressional district. The solution to the §2 violation of the Voting Rights Act in the present 1st Congressional District, is to adopt the **majority-minority coalition district** proposed by Plaintiffs. The goal is to keep communities of interests together while providing equal opportunity to Plaintiffs to elect their preferred candidate in the U.S. Congressional race in the 1st Congressional District, Chintan Desai.

3. **The extent of the jurisdiction's use of majority vote requirements, unusually large electoral districts, prohibitions on bullet voting, and other devices that tend to enhance the opportunity for voting discrimination**;

The congressional map of Arkansas is the best evidence of the configuration of each of the four congressional districts. At first blush, the map looks gerrymandered, ie, the Fayetteville Finger (District 4) and the Central Circle (District 2). One-third of the state is encompassed in the 1st Congressional District. It is irrefutable that the 1st Congressional District is unusually large. The political and economic interests of like-minded whites in the northeast part of the 1st Congressional District are diabolically opposed to the political and economic interests of the Plaintiffs who reside in the southeast section of the 1st Congressional District.

8

The 1st Congressional District is the Poster Child of Vote Dilution through Submergence. Defendants split part of Jefferson County and put it in the 1st Congressional District while the remainder of Jefferson County is in the 4th Congressional District. This tactic diluted the African American vote in Jefferson County and effectively prevented Plaintiffs and all those similarly-situated, from electing their preferred candidate in either the 1st Congressional District or the 4th Congressional District. That one tactic by defendants, "killed two birds with the same stone".

**4 Whether minority candidates are denied access to the jurisdiction's candidate slating processes, if any;**

It is apropos to address restrictive voter identification laws, which enhances the opportunity for voting discrimination. These laws are intended to discourage minority voters from turning out to the polls to vote for the candidate of their choice, while disenfranchising others, including Blacks in Southeast Arkansas. These restrictive voter id laws have been stricken in states such as Texas and North Carolina. Yet, in 2018, this defendant, State of Arkansas, continues to enforce its

restrictive voter id laws. Defendant, Arkansas Legislature is turning back the hands of time, while intentionally discriminating against the minorities in Arkansas visa-vis restrictive voting laws. Visiting history is very important.

At first, only white men who owned land could vote in the United States. Black men were not granted the right to vote until 1870 with the adoption of the Fifteenth Amendment to the U.S. Constitution. Women were not granted the right to vote until the Nineteenth Amendment to the Constitution was adopted in 1919. The voting right was denied to persons younger than 21 years of age until the Twenty Sixth Amendment was adopted in 1971. Defendant Arkansas Legislature has a long and ugly history of denying access to the ballot based on wealth, race, sex and age. It

9

should be noted that it was the Arkansas Legislature in Little Rock that passed legislation to run all of its free Blacks out of the state of Arkansas in 1859.

After the Fifteenth Amendment was ratified, Black people began voting in states where they had previously been enslaved. However, when Reconstruction ended, Black citizens were defrauded of the right to vote by various devices and schemes, such as the poll tax; economic intimidation; unconstitutional tests which required Black citizens to recite the provisions of the Constitution. In the South, Blacks were virtually disenfranchised. In Louisiana, the number of Blacks registered in 1896 was 130,344. In 1900, just 4 years later, there were only 5,320 Blacks on the registration books. What caused this phenomenon? The state re-wrote the suffrage provisions of its constitution.

Defendant, Arkansas Legislature enacted the restrictive voter identification laws to hinder people of color; citizens who are not white, not male, not wealthy; women, the poor, senior citizens, disabled persons, Blacks, Hispanics, Asians and young people, from voting in Arkansas. There is not one iota of evidence of one instance where someone tried to vote in an Arkansas election by pretending to be someone else. (See, Judge Wendell Griffen, Ugly Truth About Voter ID Laws, Little Rock Sun, Vol. 2 Number 29, Aug. 3-10, 2014). Plaintiffs posit that these restrictive voter id laws should be stricken and defendants enjoined from enforcing these restrictive voter id laws in the upcoming November 2018 elections.

**5. The extent to which the jurisdiction's minorities are discriminated against in socioeconomic areas, such as education, employment, and health;**

The African Americans in the 1st Congressional District continue to be discriminated against in all areas of everyday life. - including education, employment, healthcare and juvenile and criminal justice. They are the Poster Children of Poverty, including the Arkansas Delta.

Over the years, the courts have found violations of Section 2 when numerous challenges were made to redistricting maps involving state legislative districts. See, e.g., Smith v. Clinton. 687 F. Supp. 1310, 1311 (E.D. Ark. 1988) (three-judge court) ("Smith f') (holding that "at-large election of representatives in this multimember structure so dilutes the voting strength of [B]lack residents of the district as virtually to guarantee that no [B]lack person will ever be elected State Representative in Crittenden County"); Smith v. Clinton. 687 F. Supp. 1361 , 1363 (E.D. Ark. 1988) (three-judge court) ("Smith If), ajfd memo., 488 U.S. 988 (1988) (ordering Board to implement Plaintiffs' plan providing for single-member majority-[B]lack district in Crittenden County with "a majority [B]lack population of 60.55% among residents of voting age" to "give [B]lacks a fair opportunity to elect the candidate of their choice to the Arkansas House of Representatives [("House")], and· help to eradicate the effect of the dual-member, at-large system on participation by [B]lacks in the political process"); Jeffers 1. 730 F. Supp. at 198 (holding that the plaintiffs, 17 Black electors, "demonstrated a violation of their rights under federal law" because the 1981 apportionment plan only created five majority-minority districts-" one in the Senate and four in the House"-when "a total of 16 such districts, three in the Senate and 13 in the House, could have been created") ( footnote omitted); Jeffers v. Clinton. 756 F. Supp. 1195, 1198-1200 (E.D. Ark. 1990) ("Jeffers II) (three-judge court), affd memo., 498 U.S. 1019 (1991)

11

(rejecting as legally insufficient Board's proposed remedial plan creating a House district in Monroe and Phillips Counties with a [B]lack voting age population (BV AP) of 58 percent and a House district in Lee and St. Francis Counties with a BV AP of 56 percent and adopting plaintiffs' plans for those districts, with a BVAP of 63 percent and 64 percent, respectively, and also rejecting as legally insufficient Board's proposed remedial plan for a Senate district including portions of Crittenden, Cross, Lee, Phillips, and St. Francis Counties that had a BV AP of 55 percent and adopting Plaintiffs' plan, with a BVAP of 60.5 percent); Jeffers I1 756 F. Supp. at 1202 (opinion on reconsideration filed March 5, 1990) (granting Board's motion for reconsideration to modify the Senate district by "increas[ing] the ... BVAP ... of this District from 61 % to 62%" in order "to prevent two incumbent white senior Senators from being placed in the same district"); Jeffers v. Tucker. 847 F. Supp. 655, 660-62 (E.D. Ark. 1994) (three-judge court) (holding that [B]lack voters failed to satisfy Gingles compactness precondition for vote-dilution claim regarding Arkansas' state legislative apportionment plan for both the House and Senate because the [B]lack population was too widely dispersed for there to be a holding that the Board violated Section 2 by refusing to draw additional House and Senate districts as the [B]lack voters requested). At the liability stage of the Jeffers litigation, the court did "not hold that the law requires the creation of any particular number of majority-[B]lack districts." Jeffers I, 730 F. Supp. at 217. Instead, the court found "how many such districts can be created" and learned "that their lines can be drawn so as to make them reasonably compact and contiguous." id. Thus, the court articulated "a sort of presumption that any plan adopted should contain that number of majority-[B]lack districts." id.

12

**6. Whether overt or subtle racial appeals in campaigns exist**

The evidence shows overt racial animus by then-governor Beebe in his conversation with Mrs. Annie Abrams regarding whether the Democratic Party would support Joyce Elliott, Black African American female, in her bid for U.S. Congress in Congressional District 2. (See Affidavit - Mrs. Abrams). This is crucial evidence on the issue of white bloc-voting. White Democrats voted along race lines and propelled the white Republican to victory, as their preferred candidate, regardless of his qualifications, lack of experience or political party. The highest Democrat in the state (the governor) tacitly advocated for a white bloc vote in the 2nd Congressional District race involving Joyce Elliott.

State Senator Joyce Elliott, a faithful and loyal, hard-working Democrat over the years, was abandoned by her own party because of her race, African American Black and her fellow white Democrats voted for the white Republican over her.

**7. The extent to which minority candidates have won elections;**

By information, research and belief, no African American has ever been elected to the U.S. Congress from the State of Arkansas since Arkansas became a state. Today, we see the evidence of the reasons why and this phenomenon will continue unabated for the next 100 years, if this Court does not enjoin the unconstitutional activities of defendants, jointly and severally, in their official capacities.

**8. The degree that elected officials are unresponsive to the concerns of the minority group;**

The elected officials, defendants herein, have not been responsive at all to the concerns sent to them on numerous occasions, by email, pleading with them to at least look at the proposed re-drawn congressional district maps. No one responded. (See Affidavit-Dr. Julius Larry- Ex C). Trips were made to defendant Hutchison's office regarding whether or not the Governor had an opportunity to review the proposed congressional redistricting maps. After several trips, a liaison from the Governor's office met with Plaintiff Larry in the hallway and discussed the problem. There was never any feedback or follow-up from any of the defendants, or their agents or employees. (Affidavit - Dr. Larry). Plaintiff Larry called Congressman French Hill's office and explained the problem. No one responded one way or another and no one called with a solution to the racial gerrymandering problem in the 1st Congressional District.

**9. Whether the policy justification for the challenged law is tenuous**

There is no policy justification or legitimate explanation for the racial gerrymandering of the 1st Congressional District. See Request for Admissions to Defendants that are deemed admitted.

In Thornburg v. Gingles, 478 U.S. 30 (1986), a unanimous United States Supreme Court found that "the legacy of official discrimination ... acted in concert with the multimember districting scheme to impair the ability of ... cohesive groups of Black voters to participate equally in the political process and to elect candidates of their choice." The ruling invalidated districts of the North Carolina General Assembly and led to more single-member districts in state legislatures.

14

Under the Gingles test, Plaintiffs must show the existence of three preconditions:

**1. The racial or language minority group "is sufficiently numerous and compact to form a majority in a single-member district";**

**2. The minority group is "politically cohesive" (meaning its members tend to vote similarly); and**

**3. The "majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate"**

The first precondition is known as the "compactness" requirement and concerns whether a majority-minority district can be created. The second and third preconditions are collectively known as the "racially polarized voting" or "racial bloc voting" requirement, and they concern whether the voting patterns of the different racial groups are different from each other. If a Plaintiff proves these preconditions exist, then the Plaintiff must additionally show, using the remaining Senate Factors and other evidence, that under the **"totality of the circumstances",** the jurisdiction's redistricting plan or use of at-large or multimember elections diminishes the ability of the minority group to elect candidates of its choice.

When this Court considers the history, Senate Factors and the "totality of the circumstances", the 1st Congressional District, as presently drawn, should be invalidated and defendants enjoined from conducting any primaries for congressional districts or elections for congressional districts until this §2 violation of the Voting Rights Act is corrected.

15

Gingles Test

**1. The racial or language minority group "is sufficiently numerous and compact to form a majority in a single-member district";**

The proposed re-drawn 1st Congressional District map evidences numerosity and compactness to form a single-member district of Blacks, Hispanics and minorities, with an MVAP of 60+, according to Plaintiffs' expert, Dr. Rogelio Saenz, PhD.

**2. The minority group is "politically cohesive" (meaning its members tend to vote similarly);**

Blacks and Hispanics tend to vote for Democrats and are politically cohesive. By information and belief, when the BVAP and HVAP are combined, the MVAP will be greater than 60, which will be sufficient for Plaintiffs to elect the candidate of their choice for the new 1st Congressional; District. Once upon a time, all Blacks were Republicans of the Party of Lincoln. But, after the

Great Depression and the Franklin D. Roosevelt era, Blacks generally tended to vote Democratic. This is still true today for the most part, although there are many Black Republicans, including Plaintiff Larry. In the proposed new 1st Congressional District, African Americans, Hispanics and other minorities would have the best opportunity to elect to the U.S. Congress, their preferred candidate, **Chintan Desai**.

**3. The "majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate"**

The best evidence is Chart 1 showing the results of the 2012 congressional election in the 1st Congressional District. The "results test" is controlling. (Data from defendant Secretary of State).

16

The evidence is overwhelming that the white voters in 20 of the unusually large 30-county 1st Congressional District got their preferred candidate elected. The remaining 10 Democratic counties, where the Plaintiffs reside, showed their preferred candidate winning in those counties. However, due to vote dilution and submergence, Plaintiffs' preferred candidate could not and will never win under the present congressional district configuration. When the Court considers the totality of the circumstances and all of the evidence, including the Senate Factors, it is clear that the defendants have violated Section 2 of the Voting Rights Act and the remedy is a new 1st Congressional district map as proposed by Plaintiffs.

## B. NECESSITY OF A SPECIAL MASTER

Special Masters are commonly used in different areas of law when courts need to rely on individuals with specialized expertise to advise them. "Courts throughout the United States have chosen to appoint special masters to assist in streamlining redistricting litigation. Courts have ruled that in order to "prepar[e] plans in a timely manner, while reconciling the demands of the Constitution, the Voting Rights Act, and the redistricting principles ... an exceptional condition [exists] that requires the appointment of a Special Master to assist the court." Larios v. Cox, 306 F.Supp.2d 1212, 1213 (N.D.Ga. 2004).  Courts have used a special master to assist in evaluating and compiling data and preparing redistricting plans. See, Rodriguez v. Pataki,207 F.Supp. 2d 123 (S.D.N.Y. 2002).

When a Special Master has assisted the court, the redistricting litigation process has been more efficient, more economical and less partisan, benefitting the citizens of the states where a special master was used. The time constraints in this case provide exceptional conditions justifying the

17

appointment of a special master. For purposes of judicial economy, this case is well-suited to the appointment of a special master with expertise in demography, such as Dr. Nathaniel Persily, to assist the Panel in streamlining the process of refining the borders of the new CD1.

A Special Master would definitively define the boundaries of the new CD1. This necessarily means that the borders of CD2, CD3 and CD4 would have to be reconstructed, as set out by the computer-generated majority-minority coalition district drawn by the Redistricting Project. Only a Special Master working with Dr. Rogelio Saenz, could accomplish this task within the Court's time schedule. Once the Special Master and experts complete the new Congressional districting map, it would be presented to the Arkansas Legislature for adoption and approval. Once approved, Plaintiff will end this litigation.

## CONCLUSION

A Special Master is the best use of judicial time and parties' resources in this matter. When a new CD1 is refined, Plaintiffs will be able to elect the candidate of their choice to Congress - the Democrat, minority, son of Indian immigrants, Chintan Desai, in November 2018.

WHEREFORE, Plaintiff Larry respectfully requests the Panel to Grant his motion for appointment of a Special Master and for such other relief, at law and in equity, such that Justice is served.

Respectfully submitted,

Julius J. Larry III – Pro Se
2615 W. 12th Street
Little Rock. Arkansas 72202
832-384-6908
dr.juliusjlarry@yahoo.com

18

## CERIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff Larry's Motion for Appointment of Special

Master has been served on defendants, by and through their attorneys of record on this 3rd day

of August, 2018, by USPS and addressed to:


Vincent *P.* France
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2007
Fax: (501) 682-2591
*Attorney for State of Arkansas,*
*Arkansas Legislature, Asa Hutchinson,*
*and Leslie Rutledge*

A.J. Kelly
General Counsel and
Deputy Secretary of State
P.O. Box 251570
Little Rock, AR 72225-1570
(501) 682-3401
Fax: (501) 682-1213
*Attorney for Secretary of State*

Julius J. Larry III

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DR. JULIUS J. LARRY III**                                                     **PLAINTIFF**

**v.**                                   **Case No. 4:18-cv-00116-KGB**

**STATE OF ARKANSAS,  ET AL**                                 **DEFENDANTS**

## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS  TO DEFENDANTS

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff hereby submits the

following Requests for Admission (collectively, the "Requests" and individually, a "Request") to

defendants. Defendants are instructed to either admit or deny each Request. For each Request

that is denied, or is otherwise not admitted without qualification, defendants are to set forth in

detail the reason for each such denial or qualification.

## DEFINITIONS AND INSTRUCTIONS

In addition to the Federal Rules of Civil Procedure and the Local Rules of this Court, the

following definitions and instructions apply to these Requests:

1. Plaintiff incorporates by reference the applicable Definitions and Instructions from Plaintiffs'

First Set of Requests for Production of Documents.

2. Plaintiff incorporates by reference the applicable Definitions and Instructions from Plaintiffs'

First Set of Interrogatories to Defendants.

3. "Plaintiff(s)" shall refer to **Dr. Julius J. Larry III**.



1

4. "Defendant(s)" shall refer to **Asa Hutchinson, Leslie Rutledge, Mark Martin, Arkansas Legislature, State of Arkansas,** acting in their official capacities, and includes, but is not limited to, any predecessors or successors, and any agents, attorneys, representatives, employees, and/or other persons acting on their behalf.

5. The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request.

6. Reference to the singular in any of these Requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

7. As to each statement, defendants shall specifically admit or deny the statement. If denied, the denial must fairly meet the substance of the requested admission. If defendants qualify their answer or deny any part of the matter for which admission is requested, defendants shall admit so much of the statement as is true and qualify or deny the remainder.

8. If defendants object that a term or phrase is vague or ambiguous, defendant shall respond with its understanding of the term or phrase and specifically admit or deny the statement.

9. These Requests are continuing in nature and require supplementation pursuant to the Federal Rules of Civil Procedure.

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS

1. The defendant, Arkansas Legislature approved the present congressional district map in 2011.  Admit _____  Deny _____

2. No African American has ever been elected to the US Congress from the First Congressional District of Arkansas since Arkansas became a State.  Admit _____ Deny _____.

3. No African American has ever been elected to the US Congress from the Second Congressional District of Arkansas since Arkansas became a State.  Admit _____ Deny _____

4. No African American has ever been elected to the US Congress from the Third Congressional District of Arkansas since Arkansas became a State.  Admit _____ Deny _____.

5. No African American has ever been elected to the US Congress from the Fourth Congressional District of Arkansas since Arkansas became a State.  Admit _____ Deny _____.

6. Part of Jefferson County is in the First Congressional District while the other part is in the Fourth Congressional District.   Admit _____ Deny _____.

7. The First Congressional District contains 30 counties presently.  Admit _____ Deny _____.

8. Presently, the First Congressional District covers approximately one-third of the State of Arkansas.  Admit _____ Deny _____

9. Presently, the First Congressional District contains nearly one-third of the counties in Arkansas.  Admit _____ Deny _____.

10. A majority of African Americans in Arkansas live in the Southeastern quadrant of the State of Arkansas.  Admit _____  Deny _____.

11. A majority-minority district can be created to include Union; Ashley; Chicot; Drew; Lincoln; Jefferson; Pulaski; Desha; Arkansas; Phillips; Monroe; Lee; St. Francis; Crittenden; and Cross counties.  Admit _____ Deny _____.

3

12. The State of Arkansas has a long history of racial discrimination against minorities, including African Americans.  Admit _____   Deny _____.

13. In 1859, the Arkansas General Assembly at Little Rock passed a new law making Blacks slaves in Arkansas. Admit_____   Deny _____.

14. In 1859, the State of Arkansas ran its free Black citizens out of the state.  Admit_____ _ Deny _____.

15. After the State of Arkansas ran its free Black citizens out of the state in 1859, the state confiscated the land owned by the free Blacks it ran out, including Caulder's Bluff at Fort Smith, Arkansas (owned by Peter Caulder).  Admit _____   Deny _____.

16. Defendant Arkansas Legislature passed restrictive voter identification laws. Admit _____

Deny _____

17. Statistics show that African Americans in Arkansas tend to vote Democratic as their preferred candidate.  Admit _____ Deny _____.

18. After the 2010 US census, Pulaski County is the only county in the 2nd Congressional District to vote Democratic.  Admit _____ Deny _____.

19. In statewide elections, voting has historically been along racial lines.  Admit _____

Deny _____.

20. Minority vote dilution is still occurring in the First Congressional District.  Admit _____

Deny _____.

21. Present system is impeding minority opportunities to participate fully in the political process.  Admit _____ Deny _____.

22. The only reason no African American has ever been elected to Congress from the First Congressional District is minority vote dilution. Admit _____ Deny _____.

23. A majority-minority congressional district will cure the ongoing discriminatory effects.

Admit _____ Deny _____.

24. A significant number of African Americans in Arkansas usually vote for the same candidate, such as Joyce Elliott. Admit _____ Deny _____.

25. Pulaski County, in the Second Congressional District is submerged under the electoral control of whites in the seven other counties contained in the 2nd Congressional District. Admit _____ Deny _____.

26.  African Americans and whites in Arkansas differ in the extent to which they support competing candidates. Admit _____ Deny _____.

27. African Americans in Arkansas  have been unable to elect their preferred candidate to Congress  in the face of white opposition presently. Admit _____ Deny _____.

28. White bloc voting continues to defeat minority-preferred candidates. Admit _____ Deny _____.

29. White cross-over voting is insignificant because whites generally do not support African Americans for US Congress from Arkansas. Admit _____ Deny _____

30. Defendants have no legitimate explanation why no African American has ever been elected to Congress from Arkansas since Arkansas became a state. Admit _____

Deny _____.

Respectfully submitted,

Julius J. Larry III –Pro Se
2615 West 12th Street
Little Rock, AR 72202
(832) 384-6908
dr

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Request for Admissions to Defendants has been served by and through his attorney of record on this  3rd  day of May, 2018, by USPS and addressed to:


Vincent *P.* France
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:  (501) 682-2007
Fax:  (501) 682-2591
*Attorney for State of Arkansas,*
*Arkansas Legislature, Asa Hutchinson,*
*and Leslie Rutledge*

A.J. Kelly
General Counsel and
Deputy Secretary of State
P.O. Box 251570
Little Rock, AR 72225-1570
(501) 682-3401
Fax: (501) 682-1213
*Attorney for Secretary of State*

Julius J. Larry III

6

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN (Little Rock) DIVISION

| | |
|---|---|
| DR. JULIUS J. LARRY III, Individually And in his Official Capacity as Publisher – The Little Rock Sun Community Newspaper, and on behalf of all other Similarly-situated African Americans Residing in the Southeast Quadrant of the State of Arkansas | § § § |
| PLAINTIFFS, | § |
| | § |
| VS. | §   CASE NUMBER: *4:18-cv-116.KGB* |
| | § |
| STATE OF ARKANSAS;  ASA HUTCHINSON, in his Official Capacity as Governor of the State of Arkansas; LESLIE RUTLEDGE, in her Official Capacity as Attorney General of the State of Arkansas; MARK MARTIN, in his Official Capacity as Arkansas Secretary of State and the Arkansas Legislature, in their Official Capacities | § § § § |
| DEFENDANTS. | |

STATE OF ARKANSAS §§

§§

COUNTY OF PULASKI §§


## AFFIDAVIT OF ANNIE McDANIEL ABRAMS  IN SUPPORT OF CONGRESSIONAL REDISTRICTING  IN ARKANSAS -- 2018



1

**Before Me the Undersigned Notary Public,** personally appeared Annie McDaniel Abrams, known to me personally, and after being duly sworn, deposed and stated the following:

"My name is Annie McDaniel Abrams. I am a resident of Little Rock, Pulaski County, Arkansas; registered voter and lifelong Democrat. I am an Oral Historian, Educator and Civil Rights Activist for over 65 years. My home is a History Museum. My rich personal library of books, documents and directories are used as a free reference system for many researchers examining Arkansas history. I have spoken before hundreds of audiences in schools, churches and conferences.

I was one of the first African Americans to host a public access channel in the early days of cable tv in Little Rock. I used my show, **"The State Press in Review"**, as a platform to Enlighten and Educate my audience. The show was in production for four years. Hundreds of candidates for public office have sought my advice and have requested my endorsement. I have actively served on campaign committees and helped to elect many public servants at all levels of government in Arkansas. My beliefs and commitment for fighting for Justice, Life, and Liberty for all people are respected by my family, friends, associates, allies and even my opponents.

I have worked at the national and international level for over 30 years. In 1978, I was selected to represent the National Board of the YWCA of the U.S.A. at the **World Conference to Combat Racism and Racial Discrimination**, in Geneva, Switzerland. After leaving the conference, I became a local fixture at any event focused on eliminating class disparities in Arkansas. I served as a Commissioner for the Fair Housing Commission and on the Board of Directors for Our House. I have been directly involved in the desegregation and integration of Little Rock public schools.

I know State Senator Joyce Elliott very well. I have known her many years. Specifically, I remember when Joyce Elliott ran for the U.S. House of Representatives in the 2nd Congressional District. She had a Republican opponent, Tom Griffin, a political novice. African Americans preferred Joyce Elliot. We had a Democratic governor at the time – Governor Beebe.

I asked Governor Beebe if he would help us get Joyce elected to Congress. He replied, **"Arkansas does not have but 4 eligible seats due to the population and y'all don't deserve to have one of those four"**. As a result, white Democrats supported the white Republican over Joyce Elliott, who is Black. Tom Griffin, the white Republican won over Joyce. Joyce Elliott was a faithful, loyal and hard-working, experienced Democrat, who held offices in the Democratic Party. To my knowledge, no African American has ever been elected to Congress from the State of Arkansas since Arkansas became a State."

Further Affiant Sayeth Not.

_ANNIE McDANIEL ABRAMS_

SUBSCRIBED AND SWORN TO this _07th_ day of February, 2018, witnesseth my Hand and Seal of Office.

_Emma E. Rhodes_

NOTARY PUBLIC

My Commission expires:

_01-01-2021_

EMMA E. RHODES
NOTARY PUBLIC - ARKANSAS
PULASKI COUNTY
My Commission Expires: 1-1-2021
My Commission Number: 12380137

2

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN (Little Rock) DIVISION

| | | |
|---|---|---|
| DR. JULIUS J. LARRY III, Individually<br>And in his Official Capacity as Publisher –<br>The Little Rock Sun Community<br> Newspaper, and on behalf of all other<br>Similarly-situated African Americans<br>Residing in the Southeast Quadrant of<br>the State of Arkansas | §<br><br>§<br><br>§<br><br>§ | |
| PLAINTIFFS, | | |
| | § | |
| VS. | § | CASE NUMBER: 4:18-CV-116-KGB |
| | § | |
| STATE OF ARKANSAS;  ASA<br>HUTCHINSON, in his Official<br>Capacity as Governor of the State of<br>Arkansas; LESLIE RUTLEDGE, in<br>her Official Capacity as Attorney<br>General of the State of Arkansas; MARK<br>MARTIN, in his Official Capacity as<br>Arkansas Secretary of State and the<br>Arkansas Legislature, in their Official<br> Capacities | §<br><br>§<br><br>§<br><br>§ | |
| DEFENDANTS. | | |

STATE OF ARKANSAS  §§

§§

COUNTY OF PULASKI  §§

**AFFIDAVIT IN SUPPORT OF REQUEST FOR THREE JUDGE PANEL PURSUANT 42**
**U.S.C. § 2284**



1

**Before Me the Undersigned Notary Public,** personally appeared Dr. Julius J. Larry III, known to me personally and after being duly sworn, stated as follows:

"My name is Julius James Henry Edward Lovelace Larry III. I am 68 years old and a resident of Pulaski County and registered voter. I graduated Savannah State College (now University), Savannah, GA, magna cum laude, with a BS degree in Chemistry, in 1975. I graduated Meharry Medical College -School of Dentistry, Nashville, TN in 1978, with a DDS degree, in three and one-half years. I graduated Thurgood Marshall School of Law – Texas Southern University, Houston, TX, magna cum laude in 1984. Also, I graduated University of North Texas Health Science Center at Fort Worth, Ft. Worth, TX in 2008, with a Master of Public Health (MPH) degree.

I practiced law in Houston, TX as a Civil Rights Attorney, where I was Board-certified in Forensic Medicine and a Diplomate of the American College of Forensic Examiners.

When I changed my residency from Houston, TX to Little Rock, AR, I was immediately met by voting registration requirements that were different from Texas vis-à-vis identification required, including my passport. When I applied for an Arkansas driver's license, another set of identification requirements were met – all restrictive.

I publish the **Little Rock Sun Community Newspaper,** the only Black-owned weekly in AR, which is distributed statewide, with a weekly circulation of 50,000 and 500,000+ readers. The digital website is: www.lrsuntimes.com. In the capacity as Publisher and in furtherance of the newspaper's mission to work for Racial Justice, I met with Mrs. Annie Abrams at her house. She is an Historian, Educator and Civil Rights Activist for over 65 years. She told me the history of how Blacks in Arkansas could never elect one of their own to the U.S. Congress regardless of voter turnout.

When I inquired as to why there had never been an African American Black elected to the U.S. Congress since AR became a state, she did not know the reason, even though Black voter turnouts have been very high, especially during the Presidential election for President Obama.

This prompted me to look at the Congressional districting map. When I first saw the present congressional district map, from experience and training, I could see a convoluted, gerrymandered system. When I reviewed the election results of the 2010 Congressional race in the 1st Congressional district, I knew immediately that something was wrong in the 1st Congressional District. First of all, it is unusually large, covering 1/3 of the State of Arkansas and encompassing 30 counties. The state has 75 counties, so almost ½ of the counties are in the 1st Congressional District.

A study of the voting patterns in the 1st Congressional district showed Black vote dilution. I checked the population of each county in the state and re-drew the entire congressional districting map for fundamental fairness. I sent my findings and drawings to Governor Asa Hutchinson and many members of the Arkansas Legislature, including State Senator, Joyce Elliot and Representative Fred Allen. I sent emails to Congressman French Hill because his 2nd Congressional District, the Circle, would be affected under the proposed re-drawn plan.

2

No one responded. I made several trips to the governor's office. I delivered hard copies of the re-drawn congressional maps to the governor's Executive Administrative Assistant, who placed the documents in the governor's "To Do" file. I made several follow-up trips to the governor's office after there was no response. On the last occasion, I delivered the governor his copy of the Little Rock Sun and inquired as to whether the governor had had an opportunity to review the racial gerrymandering in the 1st Congressional District. These trips were futile and no response was ever received.

Finally, I insisted on talking with someone who could at least review the information I submitted for consideration on re-districting. A liaison from the governor's office met with me in the hallway outside of the governor's office and we thoroughly discussed the problem and the solution, in light of the history that no African American had been elected to Congress since Arkansas became a state. He said that he understood the problem, but I never heard from him again.

Committed and undaunted, I went to see Dale Charles, president of the Arkansas State Conference-NAACP. Dale Charles is also president of the local Little Rock branch. He informed me that he had tried to do something about the problem for years, in vain. I called Congressman French Hill's office and explained the problem. His office called me back to get a better understanding of the problem of racial gerrymandering in the 1st Congressional District. There was no further contact from any official regarding fixing the problem.

I called the attorney who handled the Jeffers case. His office did not return my call. So, the only option I had left was to file the instant suit seeking declaratory and injunctive relief.

My mother, Mrs. Angel Maella Vanderbilt Tillman Larry, was the Family Historian. She transitioned last year at the age of 102 and was in good mental health. My youngest sister, Geraldine Larry Williams, researched the family history for her college thesis since she was a History major. The Larrys were free men, some of whom fought in the War of 1812 and were related to Peter Caulder. After the war, they settled in Arkansas close to Fort Smith, before Arkansas became a state. They owned land and were good citizens and veterans. However, in 1859, the Arkansas General Assembly in Little Rock, passed a law to make them slaves if they did not leave the state by a deadline certain.

Many free Blacks left Arkansas and many went east to Helena and the surrounding area and lived with the Black Mississippi Choctaw. The Larry's settled in Helena, Arkansas, where they still live today and run the Larry Farm. James Larry, Edward Larry, Curtis Larry and their first cousin, WL Lovelace, fought and won the Battle of Helena on July 4, 1863, which was a great Union victory. Helena was never a part of the Confederacy. Many Black slaves in the area took the opportunity to become free by being "contraband" with the Union Army. They joined the Union Army.

The Larry's served in an all-Black Regiment that defended Helena in the trench lines from the "mutinous attacks of the traitors from Little Rock". They served in the 2nd Arkansas Infantry Regiment. So, the African Americans in the southeastern part of Arkansas, commonly called the Delta, are the True American Patriots who were on the right side of history, although nothing commemorates their Loyalty to the Union or their Heroism at the Battle of Helena on July 4, 1863. It is only a footnote in Confederate history. I visit Helena-West Helena often delivering the Little

3

Rock Sun. All I see are monuments and tributes to the Confederacy. But, the Confederate Cemetery tells the true story of who lost. It is upon this historical background that the disenfranchisement of the African American voters in the Delta is taking place today.

No one is listening or doing anything to correct racial gerrymandering in the 1st Congressional District.

Further affiant sayeth not.

SWORN AND SUBSCRIBED to this 5 day of February, 2018, witnessed my Hand and Seal of Office.

Julius J. Larry III

NOTARY PUBLIC

My Commission expires:
06-25-2025

4