**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**DR. JULIUS J. LARRY, III**                                                       **PLAINTIFF**

**v.**                                          **Case No. 4:18-cv-00116-KGB**

**STATE OF ARKANSAS,** *et al.*,                                                  **DEFENDANTS**

## ORDER

Before the Court is plaintiff Dr. Julius Larry, III's motion for leave to file first amended original complaint challenging the constitutionality of the apportionment of Congressional Districts in the state of Arkansas and first amended complaint (Dkt. No. 36). Defendants responded in opposition to Dr. Larry's motion (Dkt. Nos. 38, 39), and Dr. Larry replied (Dkt. No. 41-1). After careful consideration, and for the reasons below, the motion is denied because the proposed amended complaint is futile (Dkt. No. 36).

Further, given that Dr. Larry's proposed amendment is futile, the Court addresses the question of whether Dr. Larry has standing to bring his remaining vote dilution claim pursuant to § 2 of the Voting Rights Act of 1965, codified at 15 U.S.C. § 10302(b). The Court concludes that Dr. Larry does not have standing to bring his § 2 claim and, therefore, dismisses his original complaint without prejudice.

### I.      Factual And Procedural Background

Plaintiff Dr. Julius Larry, III filed a complaint challenging Arkansas' 2011 congressional redistricting Plan (the "2011 Plan") (Dkt. No. 1). In his original complaint, Dr. Larry alleges that the 2011 Plan racially gerrymandered the Arkansas First Congressional District in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and diluted African American votes in violation of § 2 of the Voting Rights Act of 1965 (*Id.*). This Court previously

dismissed Dr. Larry's equal protection racial-gerrymandering claim for lack of standing and convened a three-judge panel to adjudge Dr. Larry's remaining § 2 vote dilution claim (Dkt. No. 30).

### A.    Original Complaint

Dr. Larry began this case by proceeding *pro se*.  In his original complaint, he purports to bring his claims "individually and in his official capacity as publisher *The Little Rock Sun Community Newspaper*, and on behalf of all other similarly-situated African Americans residing in the Southeast Quadrant of the State of Arkansas." (Dkt. No. 1, at 1).  Dr. Larry asserts that he is an African American (*Id.*, at 5).  Dr. Larry provides a Little Rock, Arkansas, address in his signature block (*Id.*, at 27).  He avers in an affidavit submitted in support of his complaint that he is a resident of Pulaski County, Arkansas, and a registered voter (*Id.*, at 35).  Dr. Larry affirms that "he is a private citizen of the United States; a resident of the State of Arkansas, a registered voter in Pulaski County, Little Rock, Arkansas, which is presently in the Second Congressional District, but will be in the First Congressional District in a re-drawn congressional districts map." (Dkt. No. 16, at 2-3).

This Court previously concluded that, as Dr. Larry is proceeding *pro se*, he cannot represent others in this action.  *Jones ex rel. Jones v. Corr. Med. Servs., Inc.*, 401 F.3d 950, 952 (8th Cir. 2005) (determining that, as a non-attorney, a *pro se* litigant may not engage in the practice of law on behalf of others).  Therefore, the Court determined that it will not consider putative class members for standing purposes.

In his original complaint, Dr. Larry contends that the 2011 Plan "dilut[es] the voting strength of African American voters in southeastern Arkansas." (Dkt. No. 1, at 1).  Dr. Larry asserts in his original complaint that such dilution occurs as a result of "packing" a politically cohesive

block of African American voters into the Arkansas First Congressional District with "like-minded white voters" and by splitting Jefferson County, a majority-minority county, between the Arkansas First and Fourth Congressional Districts (*Id.*, at 14).  Dr. Larry further asserts in his original complaint that defendants could have drawn the First Congressional District in such a manner that "does not dilute African-American voting strength for the office of U.S. Representative." (*Id.*, at 27).  Specifically, in his original complaint, Dr. Larry proposes a new map for Arkansas' four congressional districts; in this proposed map, the First Congressional District would encompass most of the southeastern quadrant of Arkansas and include all of Jefferson and Pulaski counties (*Id.*, at 6-7).

### B.    Proposed Amended Complaint

Dr. Larry now seeks leave to amend his complaint.  He requests to add several named plaintiffs:   Annie Mabel Abrams, Reverent Reginald J. Hampton, Martha Dixon, Dorothy Jefferson, and Shirley Diane Larry (*Id.*, at 2).  Dr. Larry's motion, which "incorporate[s] [the] Original Complaint and Request for Three Judge Panel by reference as if fully set out herein," purports to challenge the apportionment of Arkansas' First, Second, and Fourth Congressional Districts, alleging that, by passing Arkansas' 2011 legislative redistricting plan, defendants violated § 2 (*Id.*, at 2, 11).  Dr. Larry's motion is not accompanied by a copy of the entire proposed amended complaint.  No lawyer has entered an appearance on behalf of Dr. Larry in this litigation.

Separate defendants State of Arkansas, Asa Hutchinson, Leslie Rutledge, Jeremy Gillam, and the Arkansas Legislature (collectively, "State Defendants") oppose Dr. Larry's motion on several grounds.  The State Defendants argue that the panel should deny Dr. Larry leave to amend because:  (1) the proposed amendment would be futile as his proposed map is a racial gerrymander and lacks the compactness required by *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986); (2) Dr. Larry

3

again improperly attempts to represent other individuals, even though he is a *pro se* plaintiff; (3) Dr. Larry lacks standing to bring his amended claim regarding Arkansas' Fourth Congressional District; (4) the proposed amendment is prejudicial to State Defendants as they have already filed motions to dismiss, they have been conducting discovery, and the amendment "creates different legal and factual issues;" and (5) Dr. Larry's proposed amendment fails to provide adequate information as to the identities of the new plaintiffs (Dkt. No. 38, 3-8). Separate defendant Mark Martin argues that Dr. Larry's motion should be denied because: (1) it violates Local Rule 5.5(e) of the Local Rules of United States District Court for the Eastern and Western Districts of Arkansas, (2) the proposed amendment is futile, and (3) the proposed amendment appears to be frivolous (Dkt. No 39, ¶¶ 2-4).

In his reply, Dr. Larry argues that defendants "are in no way harmed or prejudiced by some of the key witnesses deciding to become named-Plaintiffs and bringing lawyers." (Dkt. No. 41-1, at 2). He notes that these attorneys "know the Local Rules; their Bar Number; federal admission or pro hac vice; and filing [sic] notices of appearances." (*Id*.). Citing Federal Rule of Civil Procedure 15(a)(1)(A), he also argues that he may amend as a matter of course, without leave of this Court, as his motion for leave to amend fell within 21 days of service of the original complaint upon defendants (*Id*., at 3). In an effort to excuse his failure to comply with the Local Rule, Dr. Larry argues that the "form" of his motion "is not controlling" because "[t]he proffered Amended Complaint was attached as a part of the motion for leave to amend." (*Id*.). Dr. Larry also argues that defendants are not prejudiced by the proposed amendment, as he filed the present motion on June 1, 2018, which was the deadline for amendments agreed to by the parties in their Rule 26(f) Reports (*Id*., at 4). Further, he argues that the proposed amendment is neither futile nor frivolous, as the "redrawing of any one of the four congressional districts in Arkansas will necessarily affect

4

the boundaries of all of the [congressional districts] in the state." (*Id*., at 5).  Finally, he argues that the maps he presented—the first in his original complaint and a second in the present motion—are similar to other "oddly shaped congressional districts which exist today." (*Id*., at 6).

## II.   Discussion

For the reasons discussed below, the Court finds that Dr. Larry requires this Court's leave to amend his complaint.  The Court also determines that the proposed amendment does not comport with the Local Rules and is futile.  Accordingly, the Court denies Dr. Larry's motion for leave to file first amended original complaint challenging the constitutionality of the apportionment of Congressional Districts in the state of Arkansas and first amended complaint (Dkt. No. 36). Further, the Court finds that Dr. Larry lacks standing to bring his § 2 vote dilution claim, as it is alleged in his original complaint.  Accordingly, the Court dismisses without prejudice the original complaint (Dkt. No. 1).

### A.   Amendment As A Matter Of Course

The Court first addresses Dr. Larry's argument that he is not required by Federal Rule of Civil Procedure 15 to seek leave of the Court to file his proposed amended complaint (Dkt. No. 41-1, at 3).  "A party may amend its pleadings once as a matter of course . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1)(B).  Each named defendant filed a Rule 12(b)(1) motion more than 21 days before Dr. Larry filed his motion (*see* Dkt. Nos. 7, 13, 18).  Accordingly, Dr. Larry's ability to amend as of right expired before his most recent attempt to amend.

### B   Leave To Amend

Though Dr. Larry is precluded from amending as of right his original complaint under Rule 15(a)(1), he may still seek leave to amend under Rule 15(a)(2).  This rule permits amendment of a

5

complaint with the opposing parties' written consent, or by leave of the Court, which is to be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). While the Court should freely give leave when justice so requires, "parties do not have an absolute right to amend their pleadings, even under this liberal standard." *Sherman v. Winco Fireworks*, 532 F.3d 709, 715 (8th Cir. 2008). The Court may deny leave to amend if "there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Id.* (quotation omitted).

### 1. Prejudice

State Defendants argue that Dr. Larry's proposed amendment would be prejudicial because the State Defendants "have already filed motions to dismiss[], . . . and they have been conducting discovery." (Dkt. No. 38, at 5). Further, they argue that Dr. Larry's proposed amendment is prejudicial because it "would significantly add to the complexity of the case and to the amount of discovery that would be required." (*Id.*). Finally, the State Defendants argue that they will be unfairly prejudiced if the Court allows the proposed amendment because it "creates different legal and factual issues." (*Id.*, at 6). The Court notes that Dr. Larry's present motion, which he contends contains the proposed amended complaint, was filed on June 1, 2018, the day the parties agreed would be the deadline for amendments (*see* Dkt. No. 34, at 3 (agreeing that the proposed deadline for amending the pleadings is June 1, 2018)). Accordingly, the Court finds that defendants will not be prejudiced by Dr. Larry's proposed amended complaint.

### 2. Futility

For the following reasons, the Court concludes that granting leave to amend would be futile. The State Defendants and Mr. Martin both argue that Dr. Larry's proposed amended

complaint is futile (Dkt. Nos. 38, at 3-4; 39, at 2).  The State Defendants argue that the redrawn district proposed by Dr. Larry in his proposed amended complaint is "not a 'geographically compact area,' because it stretches from the south-west corner of Arkansas to the north-east corner of Arkansas with numerous fingerlings." (Dkt. No. 38, at 4 (quoting *Gingles*, 478 U.S. at 50)). They also argue that because the map proposed by Dr. Larry is itself the result of racial gerrymandering and is not sufficiently compact to satisfy the requirements set forth in *Gingles*, the Court should deny Dr. Larry's proposed amended complaint as futile.  "Denial of a motion for leave to amend on the basis of futility 'means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'"  *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *Cornelia I. Crowell GST Trust v. Possis Med.*, 519 F.3d 778, 782 (8th Cir. 2008)).

To establish a violation of § 2, Dr. Larry must prove what are commonly known as the "*Gingles* preconditions," including the following three elements:  "(1) the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the racial district is politically cohesive; and (3) the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1018 (8th Cir. 2006) (quoting *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425 (2006) (internal citation and modifications omitted)).  If the three preconditions are satisfied, then the Court turns to consider the totality of the circumstances.  *Bartlett v. Strickland*, 556 U.S. 1, 11-12 (2009) (citing *Gingles*, 478 U.S. at 79).

"In setting out the first requirements for § 2 claims, the *Gingles* Court explained that '[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or

7

practice.'" *Bartlett*, 556 U.S. at 15 (quoting *Gingles*, 478 U.S. at 50 n. 17) (alteration and emphasis in original).  To satisfy the first *Gingles* precondition at this stage of the litigation, Dr. Larry must demonstrate that the minority population is "sufficiently large" and "geographically compact" to constitute a majority of voters in a single-member district.  *Gingles*, 478 U.S. at 50.  As to the numerosity requirement, the Eighth Circuit has held that the effective voting population of a minority group, rather than its total population, is the correct metric.  *Cottier v. City of Martin*, 604 F.3d 553, 571 (8th Cir. 2010) ("[A] minority need only make up more than *50 percent* of the voting-age population in the relevant geographic area to satisfy the first *Gingles* factors." (internal citation and quotation omitted) (emphasis in original)).  "[T]he first *Gingles* factor . . . require[s] a majority-minority standard." *Bartlett*, 556 U.S. at 19.  "[A] party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is *greater than 50 percent*." *Id*. at 19-20 (emphasis added).  As to the minority population's geographic compactness, "the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries." *League of United Latin Am. Citizens*, 548 U.S. at 433 (citations and internal quotation omitted).

In his original complaint, Dr. Larry alleged that his "proposed re-drawn 1st Congressional District map evidences numerosity and compactness to form a single-member district." (Dkt. No. 1, at 20).  Dr. Larry did not, however, allege in that complaint that the minority population in Arkansas is sufficiently numerous to win a *majority* of votes in any re-drawn district.  For instance, Dr. Larry presents a map of "African American Demographics" in Arkansas (*Id*., at 3).  This map, which provides a percentage for each Arkansas county, does not specify whether the percentages shown relate to effective voting age population, total population, or some other metric.  Further,

nowhere in his original complaint does Dr. Larry allege that African Americans will make up a majority of the effective voting age population in his proposed Congressional district.

Perhaps to address this omission in his original complaint, Dr. Larry presents a different map along with his motion for leave to file first amended original complaint challenging the constitutionality of the apportionment of Congressional Districts in the state of Arkansas and first amended complaint (Dkt. No. 36, at 7). This map, which Dr. Larry alleges "shows the large contiguous geographically compact area to constitute a majority-minority district in a re-drawn 1st Congressional District . . . ," follows the southern and eastern border of Arkansas with portions of the proposed district extending towards central Arkansas (*see id.*). Dr. Larry alleges that this proposed district would consist of a majority-minority district "consisting of Black, Latinos, Asians and Native Americans." (*Id.*).

Assuming without deciding that this proposed district satisfies the numerosity requirement of the first *Gingles* precondition, the Court finds that Dr. Larry's proposed amended complaint fails to allege facts sufficient to satisfy the "compactness" requirement. "The first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens*, 548 U.S. at 433 (quoting *Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring)). "[Section] 2 does not require a State to create, on predominantly racial lines, a district that is not 'reasonably compact.'" *Bush*, 517 U.S. at 979 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994)). "If, because of the dispersion of the minority population, a reasonably compact majority-minority district cannot be created, § 2 does not require a majority-minority district . . . ." *Id.*

Dr. Larry's proposed amended complaint fails to allege sufficient facts from which this Court may plausibly infer that the minority population in Arkansas is "geographically compact."

Under governing precedent, the "§ 2 compactness inquiry should take into account 'traditional districting principles such as maintaining communities of interest and traditional boundaries.'" *Abrams v. Johnson*, 521 U.S. 74, 92 (1997) (quoting *Bush*, 517 U.S. at 977). Dr. Larry's proposed district, as illustrated in his motion for leave to amend, stretches from the northeast to the southwest corner of Arkansas and, at some points, is vanishingly thin (*see* Dkt. No. 36, at 7). While the Eighth Circuit has not held that a reviewing court is bound by the maps presented by plaintiffs in a § 2 vote dilution case, the purpose of the first *Gingles* precondition is to prove that a solution is possible, not necessarily to present the ultimate solution to the problem. *Gingles*, 478 U.S. at 50 n. 17; *cf. City of Belle Glade*, 178 F.3d 1175, 1199 (11th Cir. 1999) ("We have repeatedly construed the first *Gingles* factor as requiring a plaintiff to demonstrate the existence of a proper remedy."). By presenting this map—which the Court assumes satisfies the numerosity requirement—Dr. Larry demonstrates how difficult it will be for the Court to craft a remedy to the vote dilution alleged by Dr. Larry. Dr. Larry's proposed district appears to divide multiple counties, and it also appears to include Little Rock, Pine Bluff, and perhaps Texarkana, while excluding wide swaths of south-central Arkansas (Dkt. No. 36, at 7). This map is the only non-conclusory allegation in the proposed amended complaint supporting Dr. Larry's assertion that there is a geographically compact minority in Arkansas, and the map in fact tends to support the opposite conclusion. Accordingly, because Dr. Larry's proposed amended complaint fails to satisfy the first *Gingles* precondition at the pleading stage, this Court concludes that the proposed amendment would be futile. Therefore, the Court denies as futile Dr. Larry's motion for leave to file first amended original complaint challenging the constitutionality of the apportionment of Congressional Districts in the state of Arkansas and first amended complaint (Dkt. No. 36).

10

### C.   Standing To Maintain Original Complaint

Given that Dr. Larry's proposed amendment is futile, remaining before the Court is Dr. Larry's original complaint and his remaining claim that defendants diluted African American votes in violation of § 2.   The Court previously dismissed Dr. Larry's equal protection racial gerrymandering claim.   Defendants now argue that Dr. Larry's § 2 claim should be dismissed because he does not have standing to bring such a claim (Dkt. Nos. 7, 13, 18).   For the reasons set forth below, the Court dismisses Dr. Larry's § 2 claim for lack of standing.

To establish Article III standing, a plaintiff must satisfy three requirements:   "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.   Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotes and citations omitted) (alterations in original).

Section 2 of the Voting Rights Act prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which *results* in a denial or abridgment of the right of any citizen . . . to vote on account of race or color."  15 U.S.C. § 10302(b) (emphasis added). Intentional vote dilution through the drawing of district lines violates both § 2 of the Voting Rights Act and the Fourteenth Amendment, *see Rogers v. Lodge*, 458 U.S. 613, 617 (1982), and § 2 of the Voting Rights Act also forbids facially neutral districting that has the effect of diluting minority votes.  15 U.S.C. § 10302(b).

By prior Order, this Court dismissed Dr. Larry's equal protection racial gerrymandering claim because, under controlling law, a plaintiff residing outside of a district which is the subject of a racial gerrymandering claim does not have a sufficient "injury-in-fact" to challenge that legislation, absent specific evidence that the plaintiff was personally subjected to racial classification. *U.S. v. Hays*, 515 U.S. 737, 746 (1995). Whether the *Hays* rule applies to vote dilution claims under § 2 is an open question: "No circuit has developed a framework for a Section 2 standing inquiry." *Harding v. Cty. of Dallas, Texas*, No. 3:15-CV-0131-D, 2018 WL 1157166, at *5 (N.D. Tex. Mar. 5, 2018) (quoting *Pope v. Cty. of Albany*, No. 1:11-cv-0736, 2014 WL 316703, at *5 n. 13 (N.D.N.Y. Jan. 28, 2014)).

Some district courts have not applied the *Hays* rule to resolve the issue of standing in the context of a § 2 vote dilution claim. *Luna v. Cty. of Kern*, 291 F. Supp. 3d 1088, 1122 n. 14 (E.D. Cal. 2018) (finding that an out-of-district plaintiff had standing to bring a § 2 vote dilution claim because the harm in a vote dilution case is the result of the entire map, not the configuration of a particular district); *Perez v. Abbot*, 267 F. Supp. 3d 750, 774 (W.D. Tex. 2017) ("[P]laintiffs who reside in a reasonably compact area that could support an additional minority opportunity district have standing to pursue § 2 claims, even if they currently reside in an opportunity district."); *Barnett v. City of Chicago*, No. 92-C-1693, 1996 WL 34432, at *4 (N.D. Ill. Jan. 29, 1996) (concluding the requirements of § 2 standing were satisfied where "[p]laintiffs allege that many of their class members live in white majority wards which could be redrawn into majority African American wards.").

Other district courts have adopted or approved of an approach to standing that requires a plaintiff to live in the district where vote dilution occurs to bring a § 2 vote dilution claim. *Broward Citizens for Fair Districts v. Broward Cty.*, No. 12-60317-CIV, 2012 WL 1110053, at *3 (S.D.

Fla. Apr. 3, 2012) (determining individual plaintiff lacked standing to bring a § 2 vote dilution claim where he did not reside in the district that was allegedly packed); *Comm. for a Fair and Balanced Map v. Ill. Bd. of Elections*, No. 1:11-CV-5065, 2011 WL 5185567, at *1 n. 1 (N.D. Ill. Nov. 1, 2011) ("[A § 2] vote dilution plaintiff must show that he or she (1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a member of the minority group whose voting strength was diluted."); *Hall v. Virginia*, 276 F. Supp. 2d 528, 531 (E.D. Va. 2003) (finding that plaintiff did not have standing under § 2 to challenge vote dilution in a congressional district where the plaintiff did not live); *Old Person v. Brown*, 182 F. Supp. 2d 1002, 1006 (D. Mont. 2002) (holding that plaintiffs had "standing to assert their vote dilution claims in the . . . Districts in which they reside."); *see Perry-Bey v. City of Norfolk, Va.*, 678 F. Supp. 2d 348, 364 (E.D. Va. 2009) (finding that plaintiff must live in a minority-ward to have standing to assert that addition of a mayor elected at-large to the city council diluted the power of minority-ward representatives). These courts applied standing requirements that mirror those applied in equal protection racial gerrymandering cases: a plaintiff generally must live within the boundaries of the challenged district to bring a racial gerrymandering claim. *See Hays*, 515 U.S. at 744-46.

In *Hays*, the Supreme Court reasoned that:

> Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action, *cf. Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656 (1993). Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

*Hays*, 515 U.S. at 744-45.

Support for this approach to standing in § 2 vote dilution claims is derived from the same reasoning applied in *Hays*. The Voting Rights Act creates a private cause of action permitting plaintiffs to file suit if they are an "aggrieved person." 15 U.S.C. § 10302(a). A party who fulfills the injury-in-fact prong of the constitutional standing requirements generally is a "person aggrieved" and therefore fulfills the statutory standing requirement. *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 328-29 (1999) (Congress' use of "any person aggrieved" in the Census Act "eliminated any prudential concerns in [that] case"); *Sioux Falls Cable Television v. South Dakota*, 838 F.2d 249, 252 (8th Cir. 1988) (phrase "any person aggrieved" is "ordinarily sufficient to confer standing on any party satisfying the constitutional requirements"). If a plaintiff satisfies the constitutional standing requirements for a vote dilution claim under the Voting Rights Act, that plaintiff also satisfies the constitutional standing requirements for a vote dilution claim under the Fourteenth and Fifteenth Amendments. *Parker v. Ohio*, 263 F. Supp. 2d 1100, 1107 (S.D. Ohio 2003) (Graham, J., concurring), *aff'd,* 540 U.S. 1013 (2003) (noting that same standing rules applicable to Fourteenth Amendment election case should apply to claims under § 2 of Voting Rights Act "which was enacted to enforce the guarantees of the Fourteenth and Fifteenth Amendments").

Finally, the Court notes the recent Supreme Court decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018). While that case dealt with partisan vote dilution, the Supreme Court cited *Hays* for the proposition that a plaintiff alleging harm due to partisan gerrymandering must live in the allegedly gerrymandered district. *Gill*, 138 S. Ct. at 1930 (citing *Hays*, 515 U.S. at 744-45). The Court elaborated:

> To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific. An individual voter in Wisconsin is placed in a single district. He

14

votes for a single representative.  The boundaries of the district, and the composition of its voters, determine whether and to what extent a particular voter is packed or cracked.  This disadvantage to the voter as an individual, . . . therefore results from the boundaries of the particular district in which he resides.  And a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact.

*Gill*, 138 S. Ct. at 1930 (internal citations, quotations, and alterations omitted).  The Court then held that plaintiffs had failed to prove standing because "it appears that not a single plaintiff sought to prove that he or she lives in a cracked or packed district."  *Id*. at 1932.

With these precedents in mind, the Court concludes that a plaintiff asserting a § 2 vote dilution claim must live in the district where the vote dilution allegedly occurred to have standing to bring that claim.  *Hays*, 515 U.S. at 744-46.  As vote dilution is proscribed by both § 2 and the Fourteenth Amendment, the Court finds that it is unworkable to apply a different standing standard to § 2 vote dilution claims.  Further, given the recent holding in *Gill*, the Court is further convinced that a plaintiff asserting vote dilution claims must live in the district whose boundaries "cracked or packed" the plaintiff's vote.

Applying the *Hays* rule to Dr. Larry's § 2 vote dilution claim, it is clear that he lacks standing.  This Court previously concluded that, as Dr. Larry is proceeding *pro se*, he cannot represent others in this action.  *Jones*, 401 F.3d at 952.  Therefore, the Court determined that it will not consider putative class members for standing purposes.  At this time, the Court declines to reconsider that finding.  Per Local Rule 55(c)(1), "[e]very pleading, motion or other paper . . . filed in behalf of a party represented by counsel shall be signed by at least one *attorney of record* . . . ."  Local Rules of the United States District Court for the Eastern and Western Districts of Arkansas 55(c)(1) (emphasis added and omitted from original).  While Dr. Larry's motion for leave to amend is signed by two attorneys who are captioned as "Additional Counsel for Plaintiffs," neither of these attorneys has entered an appearance on behalf of Dr. Larry in this litigation.  Dr.

15

Larry also signed the motion for leave to amend (*Id*., at 12).  Accordingly, the Court finds that Dr. Larry continues to proceed *pro se*, and the Court will not consider putative class members for standing purposes.

The gravamen of Dr. Larry's § 2 vote dilution claim in his original complaint is that defendants racially gerrymandered Arkansas' First Congressional District in 2011 (Dkt. No. 1, at 19).  Specifically, Dr. Larry asserts that defendants "split part of Jefferson County" between Arkansas' First and Fourth Congressional Districts for the purposes of diluting African American votes (*Id*., at 14).  He also alleges that defendants "packed" Arkansas' First Congressional District "with like-minded white voters in the Northeastern half of the district to dilute the Black votes of the residents of the Southeastern half" of the District (*Id*., at 4).  All of these allegations focus on vote dilution within Arkansas' First Congressional District, where Dr. Larry does not live.  Dr. Larry admits that he is a registered voter in Pulaski County, Arkansas, which is located in Arkansas' Second Congressional District (Dkt. No. 16, at 2-3).  The signature block on the complaint indicates that Dr. Larry lives in Little Rock, Arkansas, within Arkansas' Second Congressional District (Dkt. No. 1, at 27).

Accordingly, because Dr. Larry does not reside in Arkansas' First Congressional District, nor has Dr. Larry presented any specific allegations in his complaint that he has been personally subjected to a racial classification, the Court finds that Dr. Larry does not have standing to bring a § 2 challenge against the apportionment of Arkansas' First Congressional District.  Dr. Larry's § 2 vote dilution claim in his original complaint is dismissed for lack of standing.

### III.   Conclusion

The Court therefore denies without prejudice Dr. Larry's motion for leave to file first amended original complaint challenging the constitutionality of the apportionment of

Congressional Districts in the state of Arkansas and first amended complaint (Dkt. No. 36).  The Court dismisses without prejudice Dr. Larry's remaining § 2 vote dilution claim in his original complaint.  As this is the last remaining claim before the Court, the Court dismisses without prejudice Dr. Larry's original complaint (Dkt. No. 1).

I am authorized to state that Circuit Judge Duane Benton and District Judge Brian S. Miller join in this Order.

So ordered this 3rd day of August, 2018.

_____
Kristine G. Baker
United States District Judge