IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN (Little Rock) DIVISION



**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

AUG 13 2018

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

| | | |
|---|---|---|
| DR. JULIUS J. LARRY III, Individually And in his Official Capacity as Publisher – The Little Rock Sun Community Newspaper; ANNIE MABEL ABRAMS; REVEREND REGINALD J. HAMPTON; MARTHA DIXON; DOROTHY JEFFERSON; SHIRLEY D. LARRY individually and on behalf Similarly-situated African Americans Residing in the Southeast Quadrant of the State of Arkansas | § § § § § § | |
| PLAINTIFFS, | § | |
| | § | |
| VS. | § | CASE NUMBER:  4:18-cv-116-KGB |
| | § | |
| STATE OF ARKANSAS; ASA HUTCHINSON, in his Official Capacity as Governor of the State of Arkansas; LESLIE RUTLEDGE, in her Official Capacity as Attorney General of the State of Arkansas; MARK MARTIN, in his Official Capacity as Arkansas Secretary of State and the Arkansas Legislature, in their Official Capacities | § § § § | |
| DEFENDANTS. | | |

**<u>PLAINTIFF DR. JULIUS J. LARRY III'S MOTION FOR RECONSIDERATION AND APPOINTMENT OF A SPECIAL MASTER WITH BRIEF AND MEMORANDUM OF POINTS AND AUTHORITIES ATTACHED</u>**

1

**TO THE HONORABLE PANEL:**

**COMES NOW,** Plaintiff, Dr. Julius J. Larry III, pro se; individually and on behalf of all other similarly situated African Americans, Hispanics and other minorities who are registered voters and residents of Arkansas and reside in the counties included in Plaintiffs' Proposed **majority-minority coalition district (new CD1),** and files this Motion for Reconsideration and Appointment of a Special Master with Brief and Memorandum of Points and Authorities, as follows:

**BACKGROUND**

On August 9, 2018, Plaintiff Dr. Larry received the Court's Order in the US mail dismissing his lawsuit. Plaintiff Larry is an advocate of the Truth and wants the justice system to function fairly and efficiently, even for African Americans, Hispanics and other minorities residing in the Arkansas Delta and in CD2.  Permitting a trial court to correct any mistakes prior to entry of a final judgment serves the interests of judicial economy. Alwood v. Harper, 973 P.2d 12 (1999).

Below are crucial points that were missed regarding defendants' burden of proof.  Also, there is new evidence from Plaintiff's expert, Dr. Rogelio Saenz, including his preliminary calculations of Plaintiff Larry's hand drawn Proposed CD1.  He is working on the computer-generated CD1 drawn by Redistricting Project and needs the Special Master to refine the boundaries so that he may finalize his calculations of the MVAP/ CVAP, which he believes will be 60+ in a new CD1 drawn by the Redistricting Project.  (See Exhibit A- **"Total Population and Citizen Voting Age Population (CVAP) for Selected Race/Ethnic Groups by Existing Congressional Districts and Proposed 1st Congressional District").**

Plaintiff Larry wants to advance the correct adjudication before appealing to the Supreme Court, including the issue of his Article III standing to bring and maintain his section 2 Voting Rights Act claim because he has been injured-in-fact as an aggrieved person within the meaning of section 2 of the VRA as set out below.

Plaintiff Larry requests Findings of Fact and Conclusions of Law on the effect of his **Supplemental Request for Three-Judge Panel to Challenge Unconstitutionality of Apportionment of Second Congressional District of Arkansas Pursuant to 28 USC section 2284 et seq.** Dkt # 23. He filed it on March 15, 2018. All State defendants filed responses. They argued, inter alia, that Plaintiff had no standing in the 4th CD. But, it is admitted that he has standing in the 2nd CD. About one month later, on April 23, 2018, the Court entered its Order. Dkt # 30. No mention was made regarding the Supplemental Request for a Three Judge Panel. Since the Court made no ruling on the responses filed by defendants and none of the defendants filed a motion to strike the supplemental complaint, Plaintiff Larry assumed that when the Court convened the three-judge panel referenced in the Order, the same Panel would hear all of the congressional redistricting matters involving CD1 and CD2 because these two adjacent districts would be affected by any change in boundaries of any one congressional district. The Original Complaint involved the 1st CD and the Supplemental Complaint added the 2nd CD. Plaintiff Larry asserts that he has always had standing in the 2nd CD for both Equal Protection claims and section 2 VRA claims. However, the Court has already ruled on the Equal Protection claims pursuant to Hays and it is law of the case.

The issue of **majority-minority coalition** districts has not been definitively decided by the Supreme Court, although many such districts are in existence today. Plaintiff Larry requests

Findings of Fact and Conclusions of Law regarding this Panel's ruling on **majority-minority coalition districts**, such as the one presented to the Court as the new CD1.

Finally, Plaintiff Larry will explain how he is an "aggrieved person" within the meaning of section 2 of the Voting Rights Act because the racial gerrymandering in CD1 has injured him personally in CD2 through representational harms. He has standing to bring a section 2 violation of the Voting Rights Act. The "cause and effect" phenomenon in CD1 has "castrated" Plaintiff Larry and every African American, Hispanic and minority in Pulaski County at the ballot box, through **"fracking"**. (**Fracking** is Plaintiff Larry's coined term for fracturing Pulaski and Jefferson Counties into the 1st CD, 2nd CD and 4th CD - resulting in minority vote dilution, in violation of section 2 of the VRA). These injuries are continuous as long as Plaintiff Larry resides in CD2. He is guaranteed that his candidate of choice, a Democrat, will lose 7- to- 1, absolutely, because the minority votes in Pulaski County are **unconstitutionally submerged** by the white votes of (7) seven Republican counties. Pulaski County is the only Democratic county in CD2. These injuries are present, on-going and capable of repetition, but evading review because there is allegedly no remedy for the racial gerrymandering in CD2.

The **"fracking"** is a direct cause of Plaintiff Larry's personal injuries which resulted from the gerrymandering in CD1 with its 30 counties. These are the injuries that give Plaintiff Larry standing to bring a section 2 violation of the Voting Rights Act as an aggrieved person. The remedy is the new CD1 proposed by Plaintiffs.

**Brief and Memorandum of Points and Authorities**

## A. Legal Standard Applicable to Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a)(1) allows one amendment of a complaint as a matter of course **within 21 days after service of the complaint,** (Fed.R.Civ. P. 15(a)(1)(A) ) or 21 days after receiving service of an answer or motion to dismiss under Rule 12(b), e, or (f), whichever is earlier" (Fed.R.Civ.P 15(a)(1)(B)). Subsequent amendments are allowed "only with the opposing party's written consent or the court's leave" (Fed.R.Civ. P 15(a)(2)) The court is instructed to "freely give leave when justice so requires". "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment". Woolsey v. Marion Labs., Inc., 934 F,2d 1453, 1462 (10th Cir. 1991).

Defendants, as the parties asserting **"futility of amendment",** have the burden of establishing futility. Plaintiff Larry asserts that **'futility'** is an **affirmative defense** and was never plead in any answer to Plaintiff's Original Complaint or Supplemental Complaint, by any defendant. Nor has any defendant filed an answer or responsive pleading admitting or denying any of the facts set out in Plaintiff's Original Complaint or Supplemental Complaint. Defendants have effectively waived all of their affirmative defenses because a Rule 12(b) motion is not a **"responsive pleading"** to a complaint. The Court is requested to enter a judgment of default against all defendants who failed to answer pursuant to the duly-promulgated Federal Rules of Civil Procedure. **Rule 12, FRCP, Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing**

    (a) **Time To Serve A Responsive Pleading**.

        (1) In General. Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

5

(A) A defendant must serve an answer:

      (i)     Within 21 days after being served with the summons and complaint; or … .

**(4) Effect of a Motion.** Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

(A) **If the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action;** or

(B) If the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

In the case at bar, the Complaint, Request for Three Judge Panel and Temporary Restraining Order was filed on 02/09/2018 and summons were issued. Dkt #1. On 02/26/2018, the State defendants filed motions to dismiss for lack of jurisdiction. Dkt #7. On 02/28/2018, Executed Summons were returned. Dkt #s 9,10,11 and 12. On 03/02/2018, defendant Mark Martin, Secretary of State, filed his Motion to Dismiss. Dkt #13. On 03/05/2018, defendant Jeremy Gillam, House Speaker, filed a motion to dismiss for lack of jurisdiction. Dkt #18.

**On 03/15/2018, Plaintiff's Supplemental Request for Three Judge Panel to Challenge Unconstitutionality of Apportionment of Second Congressional District of Arkansas Pursuant to 28 USC section 2284 et seq. was filed**. Dkt. #23. **On 04/23/2018**, the Court entered its Order granting in part 1 and denying in part Dr. Larry's request for a three-judge panel; granting 7, 15, 18, defendants' motions to dismiss to the extent defendants seek to dismiss Dr. Larry's equal protection racial-gerrymandering claim for lack of standing; … Dkt #30.

Counting 14 days from the Court's Order granting in part and denying in part, defendants' motions to dismiss, defendants' responsive pleading was due on or about May 8, 2018. The Court's Docket

6

Sheet from the District Clerk's Office does not show any responsive pleadings filed by any of the State defendants on or about May 8, 2018. In fact, the first docket entry after 05/04/2018 is 05/14/2018 Dkt #35 – Plaintiff's First Supplemental Disclosures Pursuant to FRCP 26(a).

Likewise, on 05/21/2018, Summons were issued for service on the 135 individual members of defendant, Arkansas Legislature, as their counsel did not accept service for them and challenged service as defective in his 12(b) motion. Service of Summons and Complaint was made on the members of the Arkansas Legislature, the real party in interest. On 06/01/2018, Motion for Leave to File First Amended Original Complaint Challenging the Constitutionality of the Apportionment of Congressional Districts in the State of Arkansas and First Amended Original Complaint was filed. Dkt #36.

On 06/14/2018, the State defendants filed Response[s] in Opposition to Amend/Correct Complaint. Dkt. #s 38, 39, and 40. No other Docket entry shows where any of the State defendants or defendant members of the Arkansas Legislature ever filed a responsive pleading as required by the Rules of Federal Procedure. Individual defendants (Arkansas Legislature) were required to file a responsive pleading before the end of June 2018. No such responsive pleading appears on the Court's Docket. **Rule 8, FRCP, entitled, General Rules of Pleading - 8(b)** states in pertinent part:

**(b) Defenses; Admissions and Denials**

**(1) In General. In responding to a pleading, a party must:**

**(A) State in short and plain terms its defenses to each claim asserted against it; and**

**(B) Admit or deny the allegations asserted against it by an opposing party**

7

**8(b)(6)- Effect of Failing to Deny. An allegation – other than one relating to the amount of damages – is admitted if a responsive pleading is required and the allegation is not denied**. If a responsive pleading is not required, an allegation is considered denied or avoided.

**Rule 8(c)** covers **Affirmative Defenses**. Plaintiff Larry asserts that the defense of **"futility"** is an affirmative defense in the nature of avoidance and should have been affirmatively plead in defendants' responsive pleading or answer to the Original Complaint and/or Supplemental Complaint. None of the defendants filed a responsive pleading at all and the Panel should strike all of their defenses as waived and all of Plaintiff Larry's allegations contained in the Original and Supplemental Complaints should be deemed admitted, pursuant to **Rule 8(b)(6).**

## FUTILITY

A proposed amendment is futile if the amended claim would be subject to dismissal. In determining whether a proposed amendment should be denied as futile, the Court must analyze a proposed amendment as if it were before the Court on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). In doing so, the **Court must accept as true all well-pleaded factual allegations and view them in the light most favorable to the pleading party**. The Court must then look to the specific allegations in the complaint to determine whether they plausibly support a legal claim for relief. The issue in resolving a motion to dismiss on the grounds that the complaint fails to state a claim is **"not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims".** As the U.S. Supreme Court has stated, "if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test the claim on the merits". Foman v. Davis, 372U.S. 178, 182 (1962).

8

## B. DEFENDANTS DID NOT MEET THEIR BURDEN OF PROOF OF FUTILITY

(a) Defendants presented not one iota of evidence to support their affirmative defense of **"futility".** Defendants, State of Arkansas, Asa Hutchinson, Leslie Rutledge, Jeremey Gillam, and the Arkansas Legislature argued that "(1) the proposed amendment would **be futile as his proposed map is a racial gerrymander and (2) lacks the compactness required by <u>Thornburg v. Gingles,</u> …".** Defendant Mark Martin argued that "**Plaintiff violated the Local Rule 5.5 (e) and (2) the proposed amendment is futile".** He presented no evidence whatsoever regarding how he believed the amendment would be futile. The Court stated: "**In an effort to excuse his failure to comply with the Local Rule, Dr. Larry argues that the "form" of his motion is not controlling because the proffered Amended Complaint was attached as a part of the motion for leave to amend".** (p. 4 – Opinion). In part **II. Discussion**, the Court stated: **"The Court also determines that the proposed amendment does not comport with the Local Rules and is futile:"** (p. 5 – Opinion).

(b) Defendant Martin and his attorneys are solely responsible for misleading the Court to this conclusion. Plaintiff Larry was not aware that Local Rule 5.5 (e) applied to pro se litigants. So, in 20-20 hindsight, he read Local Rule 5.5 (e). The very last sentence of 5.5(e) states: **"The requirements for amending pleadings set forth in this subsection of Rule 5.5 <u>shall not apply</u> to parties proceeding pro se".** Plaintiff Larry admits that he was aware that federal district courts had local rules. However, in the Southern District of Texas, the local rules only apply to licensed attorneys practicing before those courts and not to pro se litigants. Counsel for defendant Martin was well aware that Local Rule 5.5 did not apply to Plaintiff Larry. Indeed, all of the defendants repeatedly argued to this Court that Plaintiff

9

Larry is "pro se". Plaintiff Larry admitted that he is pro se and they falsely accused him of trying to represent other people as their lawyer. This Court ruled that he is proceeding pro se. Yet, defendant Martin and his counsel, in violation of Rule 11, advanced a frivolous claim (Dr. Larry violated Local Rule 5.5 e) and persuaded the Panel to agree with them. Relying on the representations made to the Court by defendant Martin, through his attorney, that Plaintiff Larry had indeed violated Local Rule 5.5 e, the Court ruled that such violation had indeed occurred and that Plaintiff Larry was making an excuse for his non-compliance with Local Rule 5.5 e, when the truth is that local rule 5.5 did not even apply to pro se parties. Plaintiff Larry believes that Rule 11 should apply to officers of the court, like defendant Martin's counsel, who practice before the Court. Candor and honesty should be the sine qua non of federal practice, as Plaintiff Larry has observed that "anything goes" in state practice. Defendants' attorneys should be duly sanctioned as a deterrent to other lawyers who may try to emulate government lawyers in chicanery before the Court in the future.

(c)   Plaintiff Larry posits that when the Court analyzes the claim of futility from the point of view of a Rule 12(b)(6) motion, it is clear that defendants' futility assertion must fail. When the facts are viewed in the light most favorable to Plaintiff Larry, a motion to dismiss would not be granted because the complaints and affidavits attached to the original complaint, supplemental complaint and amendment state a cause of action – minority vote dilution in violation of section 2 of the Voting Rights Act. These facts are unrefuted by any evidence adduced by defendants and presented to this Court, although they claim to have been making discovery.

10

(d) Furthermore, defendants failed to answer the Requests for Admissions and the same are deemed admitted. (See Exhibit B- **First Request for Admissions to Defendants**). Defendants have admitted all of the Gingles test, Senate Factors and a section 2 violation of the Voting Rights Act and should be estopped from asserting any other position. Defendants have attempted to make an end-run and circumvent the holding in Shapiro v. McManus, 136 S. Ct. 450 (2015), while tacitly claiming Plaintiff's complaint is constitutionally insubstantial; essentially fictitious; wholly insubstantial; obviously frivolous; and obviously without merit. Defendants have not proven "futility", an affirmative defense not plead in any responsive pleading or answer to Plaintiff's complaint.

## C. **Amendment As a Matter of Course**

The Court's Docket is the best evidence of the dates when summons were issued to the individual members of defendant Arkansas Legislature, after defendants' counsel complained about defective service in his 12(b) motion. Many times, counsel accept service for the entire Legislature without requiring that each individual member be served , as in the case at bar. Plaintiff Larry served the 135 defendant members of the Arkansas Legislature on 5/21/2018. Dkt# (it is blank) and returned proof of service on June 1, 2018. Dkt. #37.

**"A party may amend its pleadings once as matter of course within 21 days after the service of the complaint.** Plaintiff Larry asserts that he filed his amended complaint on June 1, 2018, within 21 days after he served the individual members of defendant Arkansas Legislature, the real parties in interest, who are responsible for the section 2 violation of the Voting Rights Act. Dkt # 36. Therefore, the other subparts of Rule 15 are inapplicable to the instant facts. It should be noted that defendants had 21 days after being served with the summons and complaint to file an

11

answer, admitting or denying each and every paragraph set out in Plaintiff Larry's original complaint. The record shows that none of the defendants herein filed an answer or responsive pleading in this case in accordance with the Federal Rules of Civil Procedure.

The Court decided defendants' Rule 12(b)(1) motions challenging the Court's jurisdiction and the case was not dismissed for lack of jurisdiction, as defendants had urged. However, a Rule 12(b)(1) motion is not a responsive pleading to the original complaint. Defendants never filed an answer to the original complaint. Plaintiff could not find any caselaw where a 12(b)(1) motion negated the necessity of filing a proper and timely responsive pleading or answer in accordance with the Federal Rules of Civil Procedure.

The Court also stated the following: "Accordingly, Dr. Larry's ability to amend as of right expired before his most recent attempt to amend". Plaintiff Larry apprises the Court that he previously filed a motion for leave to amend to add new parties and class counsel and to correct any defects of which defendants complained. However, the Court denied that motion to amend. So, the present motion to amend is a misnomer and should be Plaintiff Larry's Second Motion for Leave to File First Amended Original Complaint Challenging the Constitutionality of the Apportionment of Congressional Districts in the State of Arkansas and First Amended Original Complaint. Substantial justice has not been done.

Defendants argued that **"the proposed map is a racial gerrymander and is not geographically compact because it stretches from the southwest-corner of Arkansas to the north-east corner of Arkansas with many fingerlings".** Plaintiff Larry admits that race was considered in his drawing of the proposed new CD1. And, he asserts that in complying with section 2 of the Voting Rights Act, states may consider race because it is a compelling State interest to comply with section

12

2 of the Voting Rights Act.  However, "compactness" is not about how far a majority-minority district "stretches, geographically", as defendants assert.

But, defendants should not be heard to complain about the geographical extent of congressional districts in Arkansas. The 1st CD extends from the Missouri border to the Louisiana border, containing 30 counties (almost half of the state's 75 counties) and the two communities of interest in the present 1st CD are diabolically opposed.  The affluent NE in Jonesboro versus the Poster Children of Poverty in the Arkansas Delta (SE) do not have the same interests and should not be in the same congressional district.

The Court is correct that Plaintiff Larry never asserted that an **all-Black majority** congressional district could be drawn.  He asserted that a **majority-minority coalition district,** as set out in the proposed computer-generated drawing, is the **only** majority-minority district that can be drawn where minorities will make up more than 50% of the CVAP.  Plaintiff Larry filed **a Motion for the Appointment of a Special Master** to refine the boundaries because most courts have no expertise and it is not the job of the Court to redraw congressional boundaries for recalcitrant legislatures. He incorporates that motion by reference as if fully set out herein to prevent redundancy and re-urges the motion to appoint a Special Master.  After a Special Master is appointed, Dr. Rogelio Saenz can give the Court the evidence proving that a **majority-minority coalition district** can be drawn wherein the minorities in that district will have the opportunity to elect the candidate of their choice, such as Chintan Desai, the Democrat running for Congress in the 1st CD.  This is the new evidence Plaintiff Larry is presenting herein.  It is a work-in-progress. Dr. Saenz is waiting on defendant Martin, Secretary of State, to provide data at the precinct level for analysis and such data is not on defendant Martin's website, as he alleged in answers to his Interrogatories.

Plaintiff Larry communicated with Dr. Saenz, who submitted his preliminary work.   His expert report is not yet due.   With an **MVAP/CVAP of 60**, surely Plaintiffs could elect the candidate of their choice.  However, appointment of a Special Master is imperative to refine the boundaries so that definitive data may be completed to prove "compactness".  The first Gingles condition refers to the **compactness of the minority population, not to the compactness of the contested district**, as defendants argued.   It is undisputed and unrefuted by any evidence adduced before this Court that the minority population in the Arkansas Delta is compact.  They live in close-knit communities, in poverty together, across the southern border of Arkansas and east along the Mississippi River.  However, if there is a genuine dispute about this material fact, witnesses who live in the Arkansas Delta should be given the opportunity to tell their story in court about compactness, while the Special Master perfects the boundaries according to the traditional districting principles such as maintaining communities of interest and traditional boundaries.

Minorities have always lived on the fringes of the state of Arkansas in every respect – including disenfranchisement today. Interestingly, when the Court looks at some of the odd-shaped districts, where many are gerrymandered, the map of Louisiana is almost a mirror-image of Arkansas.  This is because slaves were running from slavery in Louisiana by running north- by- north-east to the Mississippi River, while slaves running from slavery in Arkansas ran south- by -south-east to the Mississippi River, where they live today – in poverty. The Supreme Court has seen, reviewed and apparently approved, many of these oddly-shaped districts.  It is not the shape of the proposed district that is controlling for the Gingles "compactness" test.  It is the compactness of the minority population that is controlling.

14






## D. CRUCIAL NEW EVIDENCE

Plaintiffs' expert, Dr. Rogelio Saenz has expended great time and effort working on data that he has had to collect from other sources because defendant Martin, Secretary of State failed to provide the requested information in discovery. (See First Set of Interrogatories to Defendant Mark Martin -Exhibit C). A summation of defendant Martin's answers is that everything is on his website. Short of a motion to compel, defendant Martin has refused to provide the precinct level data for analysis.

However, subject to those limitations, Dr. Saenz sent in his work-in-progress that he was working on before he learned of the dismissal. He stated that he was awaiting the appointment of the Special Master to define the actual boundaries so that he could complete the correct CVAP for the computer-generated majority-minority coalition district – the only one that can be drawn. Attached is what he has completed so far. (See Exhibit A- **Total Population and Citizen Voting**

Age Population (CVAP) for Selected Race/Ethnic Groups by Existing Congressional Districts and Proposed 1st Congressional District).

When the Panel considers this new evidence along with the entire record considering the Senate Factors and totality of the circumstances, the Gingles test has been met and the lawsuit should not be dismissed under a 12(b) standard when the factual allegations and affidavits are considered in the light most favorable to Plaintiff Larry. If the Court takes judicial notice of historical factors proven in Smith v Clinton; Jeffers I and Jeffers II, reproving these historic factors should not be required in this case, although there are witnesses that will testify to the Senate Factors and other matters.

### E. Procedural Confusion

Plaintiff Larry takes full responsibility for the procedural confusion involving the attorneys representing "key witnesses-turned Named Plaintiffs". Plaintiff Larry believed that a motion for leave to amend and add new Plaintiffs and class counsel was the proper procedural vehicle to ask the Court to allow him to add new Plaintiffs and inform the Court that they were bringing their own lawyers. However, the Court denied the motion for leave to amend and add class counsel. So, everyone was in limbo about the status of the putative named- Plaintiffs and their attorneys. Ostensibly, the motion was denied in part because the Court observed that no lawyers had signed on as of that date. By what authority would they have to sign on if their clients are not joined in as named Plaintiffs?

So, Plaintiff Larry tried to apprise the Court another way through filing a Supplemental Request for a Three Judge Panel that he believed would be added to the Original Complaint and the same Panel hear all of the redistricting matters rather than filing separate lawsuits challenging each congressional district. This was best for judicial economy. No ruling was made regarding the

16

supplemental request. Finally, the attorneys signed a pleading indicating their appearance although there was no Order granted allowing their clients into the lawsuit as named- Plaintiffs. These new named -Plaintiffs were key witnesses that were set out in the Rule 26a Disclosures. Defendants were fully aware of the names, addresses, and proffered testimony of each of them.

Plaintiff Larry timely supplemented his Rule 26 Disclosures as new information became available. Defendants are in no way prejudiced by key witnesses becoming named- Plaintiffs and bringing lawyers licensed in Arkansas. Plaintiff Larry personally visited with Mr. Gene McKissic at his law offices in Pine Bluff, AR. He affirmed that he represents **Mrs. Shirley Diane Larry** and **Mrs. Dorothy Jefferson**, whom are both African American females who reside in Helena, Phillips County, AR in CD1 and are registered voters and vote Democratic. Plaintiff Larry met personally with Mr. Jimmy Morris, who affirmed that he represents **Mrs. Annie Abrams** and **Mrs. Martha Dixon**, both African American females, registered voters. Both were disclosed to defendants, including the subject-matter of their testimony. Plaintiff Larry spoke with Mr. Q. Byrum Hurst by telephone and he affirmed that he represents **Rev. Reginald J. Jackson** and that he believed that he had already entered an appearance and that he would check his files. Rev. Hampton was disclosed in the Rile 26 Disclosures. So, defendants cannot be heard to complain of surprise or prejudice by these key witnesses becoming named-Plaintiffs.

The gravamen of the situation is that there was no Order given or signal that the key witnesses were granted permission by this Court to become named- Plaintiffs and bring their own attorneys, who are licensed to practice law in Arkansas. Contrary to defendants' numerous assertions, Plaintiff Larry never intended or "tried to represent other people". He represented himself individually and held himself out as a "Class Representative" in a Class Action because he believes that all congressional redistricting cases should proceed as class actions for judicial economy.

17

An Order allowing the putative named- Plaintiffs to become parties to the litigation will also cure any standing problem because **Mrs. Shirley Diane Larry** and **Mrs. Dorothy Jefferson reside in the 1st Congressional District**, although Plaintiff Dr. Larry resides in the adjacent 2nd Congressional District. Both are represented by counsel.

F. **Plaintiff Larry Has Article III -- STANDING – "INJURY- IN- FACT" and "EXPECTED EFFECTS" – See Dep't of Commerce v. US House of Representatives**

Plaintiff Larry is an "aggrieved person" within the meaning of section 2 of VRA and has been and is continuing to be personally injured by the defendants' conduct in the 1st CD that adversely injures him in CD2, (See Affidavit of Dr. Larry) as follows:

Plaintiff Larry is in no way asking the Court to revisit its decision on standing in the Equal Protection claims under the 14th and 15th Amendments. However, as an "aggrieved person" under section 2 of the Voting Rights Act, he should be allowed to prove injury-in-fact and may also establish Article III standing on the basis of the **"expected effects"** of continuing unlawful conduct by defendants in CD1 and CD2.

The Court made no ruling on Plaintiff Larry's Supplemental Complaint that added the 2nd Congressional District to the Original Complaint.   Plaintiff Larry resides in the 2nd CD and any question of standing would be moot.  Defendants have not challenged Plaintiff Larry's standing in the 2nd CD.  Their opposition was to standing in the 4th CD. No motion to strike the Supplemental Complaint was ever filed by any defendant.

Although the Supreme Court has not definitively decided the issue of plaintiffs living in the challenged district in order to bring a section 2 claim under the Voting Rights Act, by analogy this Panel applied the results from Equal Protection claims, to section 2 Voting Rights Act claims,

18

citing Hays.    However, Plaintiff Larry shows that the defendant Arkansas Legislature's unconstitutional conduct in creating the gerrymandered 1st CD with 30 counties, forced the adjacent, 2nd CD to have only 8 counties.  Plaintiff Larry lives in Pulaski County, the only one of the 8 counties that votes Democratic.  If he votes for Democratic candidates of his choice, he is guaranteed to lose 7 to 1 in every election.  This **representational harm** is continuing for as long as he lives in Pulaski County and Pulaski County is in the current 2nd Congressional District. Every African American and minority residing in Pulaski County has been politically-castrated, disenfranchised and injured-in-fact by defendants' gerrymandering of the 1st CD.  All of their votes are a nullity in CD2.  Plaintiff Larry's votes are a nullity in Pulaski County in CD2. (See Plaintiff Larry's Affidavit).  **Fracking**, the fracturing of Pulaski County and Jefferson County into the 1st, 2nd and 4th CDs is the main culprit in the injury to Plaintiff Larry directly caused by defendants' unlawful conduct in CD1.

Plaintiff Larry is more injured personally than all of the minorities in the 1st CD because they have a remedy at law, the new CD1 presented to the Court.  But, he has no legal remedy in 2nd CD living in Pulaski County and the only likely redress is to adopt Plaintiffs' new CD1 map.  Every time he votes for a Democrat in the 2nd CD, it is a foregone conclusion that his vote has been wasted and nullified.  Since the 2nd CD is an absolute gerrymander with no legal remedy, Plaintiff Larry's representational harm is continuing unabated for as long as he resides in CD2.  The **"cause and effect phenomenon"** in CD1, which has its adverse effects in CD2, is simple.  Jesus taught in parables to keep it simple.  Common sense is good, also.

"If a river is located physically on land in CD1, where 'A' lives and that river floods across the imaginary district boundary and destroys B's home which is adjacent in CD2, it is easy to see that B has been injured-in-fact by circumstances occurring in CD1".  Let's say that A and B are

19

neighbors and A's house is on the property line of CD1 and B's house is next door across the imaginary district line in CD2. A's house catches on fire and the wind blows the fire west and B's house burns to the ground. It is easy to see how B has been injured-in-fact by the cross-border activity of the fire at A's house in CD1.

"A"'s farm is located in CD1 and "B"'s farm is located in CD2, adjacent to each other and only the imaginary congressional district line separates their properties. "A" drills an oil well on his farm close to the district property line and slant drills and captures oil from under "B"'s farm in CD2. Has "B" been injured-in-fact? Of course. This cause and effect is true in assessing injury-in-fact because the harm in a vote dilution case is the result of the entire map, not the configuration of a particular district. Luna v. City of Kern, 291 F. Supp3d 1088, 1122 n. 14 (E.D. Cal. 2018). See also, Perez v. Abbott. However, Dep't of Commerce v. US House of Representatives, 525 U.S. 328 (1999) is most instructive on the principle of how actions in one county may cause an injury-in-fact in another county for Article III standing purposes. In fact, this case involved the potential harm of **intrastate vote dilution** effecting **voters in nine counties and residents of 13 states**. As an aggrieved person, Plaintiff Larry has Article III standing because the personal injury (injury-in-fact) is directly traceable to the unlawful conduct of defendants in CD1. His injury can only be redressed by removing Pulaski County from CD2 and placing it in the new CD1 proposed by Plaintiffs.

## Expected Effects of Continuing Unlawful Conduct in CD1

The same is true with election results in CD2. The current Black CVAP in CD2 is 118,760 and the white CVAP in CD2 is 411,612. The current Black CVAP in CD1 is 120,673 and white CVAP is 458.133. Therefore, Plaintiff Larry's representational harm is not conjectural or hypothetical, but real. This data, taken from Dr. Saenz' partial analysis, (Ex. A) shows that as long as Plaintiff

20

Larry resides in CD2, he will be a loser when it comes to electing a candidate of his choice. His injury- in- fact is capable of repetition yet evading review if he has no standing to challenge his condition of vote submergence.  The only solution is to move Pulaski County from the 2nd CD and place it in the new CD1 as Plaintiff' Larry proposed. And, Plaintiff Larry has standing by way of personal injury, to make a challenge under section 2 of the Voting Rights Act as an "aggrieved person" because the practical effect of the unconstitutional section 2 violation in CD1 has injured him in CD2.  It is a virtual certainty that he will continue to be personally injured by defendants' unlawful conduct as long as he resides in CD2 as presently drawn. He has Article III standing on the basis of the expected effects of the continuing unlawful conduct by defendants in CD1 that will continue to injure him in CD2 in futuro.

Plaintiff Larry urges the Panel to analogize Dept of Commerce v. US House of Representatives, 525 U.S. 316 (1999), with the case at bar.  For purposes of Article III standing, the harm and injury-in-fact can cross state lines.  The case involved the predicted harm of **"intrastate vote dilution". The first suit was filed in the Eastern District of Virginia by four counties and residents of 13 states.  The second suit was filed by the U.S. House of Representatives in the District Court for the District of Columbia.  Each of the courts held that the plaintiffs satisfied the requirements for Article III standing.** In that case, "the appellees submitted an affidavit that demonstrated that it is a virtual certainty that Indiana, where appellee Hosfmeister resides, will lose a House seat under the proposed census 2000 plan.  That loss undoubtedly satisfies the injury-in-fact requirement for standing, since Indiana residents' votes will be diluted by the loss of a Representative." See, also **Baker v. Carr**, 369 U.S. 186, 208 (1962)("one person one vote").   The Supreme Court in Dep't of Commerce stated that: **"Appellees have demonstrated that voters in 9 counties, including several of the appellees, are substantially**

21

**likely to suffer intrastate vote dilution as a result of the Bureau's plan".** If a harm originating in Washington, DC could cause intrastate harm in Indiana and other states and harm voters in nine (9) counties such that the residents have Article III standing because of injury-in-fact, certainly Plaintiff Larry has Article III standing when the harm to him originates next door in CD1 and its harmful effect is causing personal injury to Plaintiff Larry in CD2. (See Plaintiff Larry's Affidavit -Harm -Ex. D). Plaintiff Larry has attached the Affidavit of Mrs. Annie Abrams (Ex. E) for the concrete conclusion that no African American running for Congress from the 2nd Congressional District has ever won (State Senator Joyce Elliott's matter is the example of white bloc voting in CD2) and will never win under the present districting plan. In fact, in the most recent Democratic primary in the 2nd CD, Plaintiff Larry's candidate of choice, Jonathan Dunkley, Black Democrat, lost, as predicted. Plaintiff Larry wasted his vote and was personally injured by defendants' unlawful conduct in CD1 that forced Pulaski County into CD2. It is not speculation, but Plaintiff Larry's prediction, that no minority will ever be elected to the US Congress from CD2 as long as the present burden is in place caused by defendants. It is with virtual certainty that Plaintiff Larry's personal injury due to racial animus will continue in CD2 as long as he lives there, and he expects that his candidates of choice will lose every Congressional election in CD2 from now on, thereby insuring that Democracy is effectively nullified for him in CD2 and all other similarly situated minorities in CD2 and CD1.

Although Hays' requirement that a plaintiff must reside in the district being challenged for Equal Protection purposes, the same cannot be true for section 2 violations of the VRA. Dep't of Commerce makes it clear that an "aggrieved person" may have standing to challenge an action arising in another jurisdiction if he may be injured-in-fact by such action that is caused by the defendants' unlawful conduct and the relief he seeks will remedy the problem. The purpose of

22

compliance with section 2 of the Voting Rights Act has special significance different from the Equal Protection claims of the 14th and 15th Amendments in voting rights cases. If residency in the district was required in Dep't of Commerce plaintiffs, everyone plaintiff would have to be a resident of Washington, DC.  For purposes of section 2 of the VRA, the better reasoned position is that the plaintiff show **"injury-in-fact"** directly connected to defendants' alleged unlawful conduct or prove the harm caused on the basis of **"expected effects"** is traceable to defendants' unlawful conduct.   It should not matter where the harm originated but where its harmful effects are manifested.  Therefore, the Hays residency requirement in Equal Protection claims do not apply to section 2 Voting Rights Act claims brought by "aggrieved persons" who show injury-in-fact for Article III standing or have standing on the basis of "expected effects" of the unlawful conduct.

## Lack of Complexity

Defendants have argued about the 'complexity' of the case, etc.  But, this case is straight forward-only section 2 minority vote dilution claims. Jeffers I and Jeffers II, along with Abbott v. Perez, were complex.  If this case was complex, it would be impossible to have a trial in October 2018, prior to the November 2018 elections.  Since it is simple and straight-forward, all is needed is the Special Master's drawings refining the only **majority-minority coalition district** that can be drawn in Arkansas and Dr. Saenz' expert report.

WHEREFORE, for all of the foregoing reasons, Plaintiff Dr. Larry requests the Panel to reconsider its positions in light of new evidence; **Dep't of Commerce v. US House of Representatives**; appoint a Special Master  in the interest of justice;  and for such other relief, at law and in equity, such that justice prevails.

23

Respectfully submitted,

Julius J. Larry III – Pro Se
2615 West 12th Street
Little Rock, AR 72202
(832) 384-6908
dr.juliusjlarry@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of PLAINTIFF DR. JULIUS J. LARRY III'S MOTION FOR RECONSIDERATION AND APPOINTMENT OF A SPECIAL MASTER WITH BRIEF AND MEMORANDUM OF POINTS AND AUTHORITIES ATTACHED has been served on defendants, by and through their attorneys of record on this 13th day of August, 2018, by certified mail, return receipt requested and addressed to:

Vincent *P*. France
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone: (501) 682-2007
Fax:  (501) 682-2591
*Attorney for State of Arkansas,*
*Arkansas Legislature, Asa Hutchinson,*
*and Leslie Rutledge*

A.J. Kelly
General Counsel and
Deputy Secretary of State
P.O. Box 251570
Little Rock, AR 72225-1570
(501) 682-3401
Fax: (501) 682-1213
*Attorney for Secretary of State*

Michael J. Fincher
Assistant Secretary of State
500 Woodlane Drive – Suite 256
Little Rock, AR 72201

Julius J. Larry III – Pro Se

24

**Total Population and Citizen Voting Age Population (CVAP) for Selected Race/Ethnic Groups by Existing Congressional Districts and Proposed 1st Congressional District.**

| Congressional Distict (CD) | CD Total Population | Total CVAP | Black Total Population | Black CVAP | White Population | White CVAP | Hispanic Population | Hispanic CVAP | Nonwhite Population | Nonwhite CVAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Current 1st CD | 794,792 | 599,527 | 169,598 | 120,673 | 581,225 | 458,133 | 24,422 | 10,113 | 213,567 | 141,394 |
| Current 2nd CD | 754,821 | 559,250 | 167,337 | 118,760 | 520,589 | 411,612 | 37,678 | 13,487 | 234,232 | 147,638 |
| Current 3rd CD | 798,941 | 552,661 | 22,835 | 15,875 | 612,780 | 477,651 | 106,727 | 31,444 | 186,161 | 75,010 |
| Current 4th CD | 619,918 | 463,900 | 100,868 | 74,006 | 463,306 | 368,542 | 38,222 | 11,164 | 156,612 | 95,358 |
| Proposed 1st CD | 731,244 | 541,245 | 291,116 | 208,384 | 382,908 | 308,837 | 33,447 | 12,002 | 348,336 | 232,408 |

Data Source: 2016 American Community Survey 5-Year Estimates based on Arkansas Counties. (American FactFinder)

Notes related to the presentation of the data in original Census Bureau files:
The Hispanic population can be of any race.
The Black population includes Hispanics who identified their race as Black.
The White population includes persons who did not identify as Hispanic.
The Nonwhite population is derived by taking the difference between the CD total population and the CD White population.



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**DR. JULIUS J. LARRY III**                                      **PLAINTIFF**

v.                                      **Case No. 4:18-cv-00116-KGB**

**STATE OF ARKANSAS,  ET AL**                                      **DEFENDANTS**

## PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS  TO DEFENDANTS

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff hereby submits the following Requests for Admission (collectively, the "Requests" and individually, a "Request") to defendants. Defendants are instructed to either admit or deny each Request. For each Request that is denied, or is otherwise not admitted without qualification, defendants are to set forth in detail the reason for each such denial or qualification.

## DEFINITIONS AND INSTRUCTIONS

In addition to the Federal Rules of Civil Procedure and the Local Rules of this Court, the following definitions and instructions apply to these Requests:

1. Plaintiff incorporates by reference the applicable Definitions and Instructions from Plaintiffs' First Set of Requests for Production of Documents.

2. Plaintiff incorporates by reference the applicable Definitions and Instructions from Plaintiffs' First Set of Interrogatories to Defendants.

3. "Plaintiff(s)" shall refer to **Dr. Julius J. Larry III**.



1

4. "Defendant(s)" shall refer to **Asa Hutchinson, Leslie Rutledge, Mark Martin, Arkansas Legislature, State of Arkansas,** acting in their official capacities, and includes, but is not limited to, any predecessors or successors, and any agents, attorneys, representatives, employees, and/or other persons acting on their behalf.

5. The words "or," "and," "all," "every," "any," "each," "one or more," "including," and similar words of guidance, are intended merely as such, and should not be construed as words of limitation. The words "or" and "and" shall include each other whenever possible to expand, not restrict, the scope of the Request.

6. Reference to the singular in any of these Requests shall also include a reference to the plural, and reference to the plural also shall include a reference to the singular.

7. As to each statement, defendants shall specifically admit or deny the statement. If denied, the denial must fairly meet the substance of the requested admission. If defendants qualify their answer or deny any part of the matter for which admission is requested, defendants shall admit so much of the statement as is true and qualify or deny the remainder.

8. If defendants object that a term or phrase is vague or ambiguous, defendant shall respond with its understanding of the term or phrase and specifically admit or deny the statement.

9. These Requests are continuing in nature and require supplementation pursuant to the Federal Rules of Civil Procedure.

2

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS

1. The defendant, Arkansas Legislature approved the present congressional district map in 2011. Admit _____ Deny _____

2. No African American has ever been elected to the US Congress from the First Congressional District of Arkansas since Arkansas became a State. Admit _____ Deny _____.

3. No African American has ever been elected to the US Congress from the Second Congressional District of Arkansas since Arkansas became a State. Admit _____ Deny _____

4. No African American has ever been elected to the US Congress from the Third Congressional District of Arkansas since Arkansas became a State. Admit _____ Deny _____.

5. No African American has ever been elected to the US Congress from the Fourth Congressional District of Arkansas since Arkansas became a State. Admit _____ Deny _____.

6. Part of Jefferson County is in the First Congressional District while the other part is in the Fourth Congressional District. Admit _____ Deny _____.

7. The First Congressional District contains 30 counties presently. Admit _____ Deny _____.

8. Presently, the First Congressional District covers approximately one-third of the State of Arkansas. Admit _____ Deny _____

9. Presently, the First Congressional District contains nearly one-third of the counties in Arkansas. Admit _____ Deny _____.

10. A majority of African Americans in Arkansas live in the Southeastern quadrant of the State of Arkansas. Admit _____ Deny _____.

11. A majority-minority district can be created to include Union; Ashley; Chicot; Drew; Lincoln; Jefferson; Pulaski; Desha; Arkansas; Phillips; Monroe; Lee; St. Francis; Crittenden; and Cross counties. Admit _____ Deny _____.

3

12. The State of Arkansas has a long history of racial discrimination against minorities, including African Americans.  Admit _____    Deny _____.

13. In 1859, the Arkansas General Assembly at Little Rock passed a new law making Blacks slaves in Arkansas. Admit_____    Deny _____.

14. In 1859, the State of Arkansas ran its free Black citizens out of the state.  Admit_____ _ Deny _____.

15. After the State of Arkansas ran its free Black citizens out of the state in 1859, the state confiscated the land owned by the free Blacks it ran out, including Caulder's Bluff at Fort Smith, Arkansas (owned by Peter Caulder).  Admit _____    Deny _____.

16. Defendant Arkansas Legislature passed restrictive voter identification laws. Admit _____

    Deny _____

17. Statistics show that African Americans in Arkansas tend to vote Democratic as their preferred candidate.  Admit _____ Deny _____.

18. After the 2010 US census, Pulaski County is the only county in the 2nd Congressional District to vote Democratic.  Admit _____ Deny _____.

19. In statewide elections, voting has historically been along racial lines.  Admit _____

    Deny _____.

20. Minority vote dilution is still occurring in the First Congressional District.  Admit _____

    Deny _____.

21. Present system is impeding minority opportunities to participate fully in the political process.  Admit _____ Deny _____.

4

22. The only reason no African American has ever been elected to Congress from the First Congressional District is minority vote dilution.  Admit _____ Deny _____.

23. A majority-minority congressional district will cure the ongoing discriminatory effects.

Admit _____ Deny _____.

24. A significant number of African Americans in Arkansas usually vote for the same candidate, such as Joyce Elliott.  Admit _____ Deny _____.

25. Pulaski County, in the Second Congressional District is submerged under the electoral control of whites in the seven other counties contained in the 2nd Congressional District. Admit _____ Deny _____.

26.  African Americans and whites in Arkansas differ in the extent to which they support competing candidates.  Admit _____ Deny _____.

27. African Americans in Arkansas  have been unable to elect their preferred candidate to Congress  in the face of white opposition presently.  Admit _____ Deny _____.

28. White bloc voting continues to defeat minority-preferred candidates.  Admit _____ Deny _____.

29. White cross-over voting is insignificant because whites generally do not support African Americans for US Congress from Arkansas.  Admit _____ Deny _____

30. Defendants have no legitimate explanation why no African American has ever been elected to Congress from Arkansas since Arkansas became a state.  Admit _____

Deny _____.

5

Respectfully submitted,

Julius J. Larry III – Pro Se
2615 West 12th Street
Little Rock, AR 72202
(832) 384-6908
dr

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's Request for Admissions  to Defendants has been served by and through his attorney of record on this    3rd  day of May, 2018, by USPS and addressed to:

Vincent *P.* France
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:  (501) 682-2007
Fax:  (501) 682-2591
*Attorney for State of Arkansas,*
*Arkansas Legislature, Asa Hutchinson,*
*and Leslie Rutledge*

A.J. Kelly
General Counsel and
Deputy Secretary of State
P.O. Box 251570
Little Rock, AR 72225-1570
(501) 682-3401
Fax: (501) 682-1213
*Attorney for Secretary of State*

Julius J. Larry III

6

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**DR. JULIUS J. LARRY III**                                                   **PLAINTIFF**

**v.**                                               **Case No. 4:18-cv-00116-KGB**

**STATE OF ARKANSAS, ET AL**                                                   **DEFENDANTS**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT MARK MARTIN - SECRETARY OF STATE OF ARKANSAS

**Defendant, Mark Martin ("Secretary of State" or "defendant Martin")** is instructed to answer these Interrogatories separately and fully, in writing and under oath. You are required to respond to these interrogatories no later than thirty (30) calendar days after receipt of these interrogatories, to the undersigned 2615 W. 12th Street, Little Rock, AR 72202.

## INSTRUCTIONS

A. Each Interrogatory is to be answered fully on the basis of information which is in your possession, care, custody and control.

B.  In each of your answers to these Interrogatories, you are requested to provide not only such information as is in your possession, but also information as is reasonably available. In the event that you are able to provide only part of the information called for by any particular Interrogatory, please provide all the information you are able to provide and state the reason for your inability to provide the remainder.



1

C. If you object to or otherwise decline to answer any portion of an Interrogatory, please provide all information called for by that portion of the Interrogatory to which you do not object or to which you do not decline to answer. For those portions of an Interrogatory to which you object or to which you decline to answer, state the reason for such objection or declination.

D. Every Interrogatory herein shall be deemed a continuing interrogatory and you are instructed to update all information provided that would in any way be inconsistent with your initial answer to such Interrogatory.

E. If any of the following Interrogatories can be answered fully and completely by referring to an exhibit number, page, and paragraph of the investigative file compiled by the defendant in connection with this complaint of discrimination, such references, if adequately identified to inform the Plaintiff as to your response will serve as a satisfactory response to such Interrogatory.

## DEFINITIONS

A. "Plaintiff" means **DR. JULIUS J. LARRY III.**.

B. "Defendant", "you," "your," or "yourself," means all of the named defendants in the above-styled cause and any and all of its agents, representatives, employees, servants, consultants, contractors, subcontractors, investigators, attorneys, and any other persons or entities acting or purporting to act on behalf of defendants.

2

C.  "Person", "persons," "people", and "individual" means any natural person, together with all federal, state, county, municipal and other government units, agencies or public bodies, as well as firms, companies, corporations, partnerships, proprietorships, joint ventures, organizations, groups of natural persons or other associations or entities separately identifiable whether or not such associations or entities have a separate legal existence in their own right.

D.  "Document," "documents," and "writing" means all records, papers, emails, text messages, blogs, twitter communications, all social media communications and books, transcriptions, pictures, drawings or diagrams or every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, whether in your actual or constructive possession or under your control or not, relating to or pertaining to or in any way to the subject matters in connection which it is used and includes originals, all file copies, all other copies, no matter how prepared and all drafts prepared in connection with such writing, whether used or not, including by way of illustration and not by way of limitation, the following; books; records; reports; contracts; agreements; catalogues; video, audio and other electronic recordings; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities regarding drawing of congressional district lines in Arkansas after each US Census from 1920 to 2010; minutes; diaries; calendars; desk pads; scrapbooks; notes; notebooks; emails; correspondence; drafts; bulletins; electronic mail; facsimiles; circulars; forms; pamphlets; notices; statements; journals; postcards; letters; telegrams; publications; inter- and intra- office communications;

3

photographs; microfilm; maps; drawings of proposed congressional districts; diagrams; sketches; analyses; electromagnetic records; transcripts; and any other documents within defendants' possession, custody or control from which information can be obtained or translated, if necessary, by detection devices into reasonably usable form.

E.  "Communication" or "communications" means any and all inquiries, discussions, emails, text messages, FaceBook, all social media communications, conferences, conversations, negotiations, agreements, meetings, interviews, telephone conversations, letters correspondence, notes telegrams, facsimiles, electronic mail, memoranda, or other forms of communications, including but not limited to both oral and written communications regarding congressional redistricting for the 2010 US census .

F.  "Produce" and "provide" mean to provide either a legible true copy of the original or any document and/or communication that is authentic.

G.  "Relate to," "relating to," "concerning," "pertain," and "pertaining to," mean consisting of, referring to, reflecting or arising out of, evidencing or in any way legally, logically, or factually connected with the matter discussed, directly or indirectly.

H.  "Identify," "identifying," and "identification" when referring to a person mean to provide an identification sufficient to notice a deposition of such person and to serve such person with process to require his or her attendance at a place of examination and shall include, without limitation, his or her full name, present or last known address, present or last known business affiliation, home and business telephone number, title or occupation as relates to their function in congressional redistricting after the 2010 US census.

I.  "Identify," "identifying," and "identification" when used in reference to a writing or document mean to give a sufficient characterization of such writing or document to

4

properly identify it in a request to produce and shall include, without limitation, the following information with respect to each such document:

1. The date appearing on such document, and if it has no date, then answer shall so state and shall give the date or approximate date such document was prepared;

2. The identity or descriptive code number, file number, title or label of such document;

3. The general nature and description of such document, and if it was not signed, the answer shall so state and shall give the name of the person or persons who prepared it;

4. The names of the person(s) to whom such document was addressed and the name of each person other than such addressee to whom such document or copies of it, were given or sent;

5. The name(s) of the person(s) having present possession, custody, or control of such document(s); and

6. Whether or not any draft, copy or reproduction of such document contains any postscripts, notations, changes or addendum not appearing on the document itself, and if so, the answer shall give the description of each such draft, copy or reproduction.

7. All emails/text messages by and between defendants regarding congressional redistricting after the 2010 US census.

In answering these interrogatories, the defendants are requested to furnish not only such information as is available to the defendant but also such information as is known to any of the defendants' agents, representatives, employees, servants, consultants, contractors, subcontractors, investigators, attorneys, and any other person or entity acting or purporting to act on behalf of the defendants.

In any matter responsive to any of these Interrogatories, the defendants shall set forth completely, the grounds for any asserted privilege, along with copies of written materials upon which such assertion is made. The defendants shall identify as to each privileged communication or document:

1. its date;

2. its author(s);

3. the business title or position of its author(s);

4. its recipient(s);

5. the business title or position of its recipient(s);

6. its number of pages;

7. its stated subject matter;

8. the legal basis upon which the defendants claim privilege;

9. the specific portion of the interrogatory or document to which the communication or document is responsive.

Documents are to be labeled to indicate the interrogatory to which they respond.

In order to simplify the issues and resolve as many matters of fact as possible before trial, if, following a reasonable and thorough investigation using due diligence, you are unable

to answer any interrogatory, or any part thereof, in full, because sufficient information is not available to you, answer the interrogatory to the maximum extent possible, including any knowledge or belief you have concerning the unanswered portion thereof and the facts upon which such knowledge or belief is based. In addition, also state what you did to locate the missing information and why that information is not available to you.

When an exact answer to an interrogatory is not known, state the best estimate available; state that it is an estimate and state the basis for such estimate.

If documents once in your possession, care, custody or under your control are requested or are the subject of an interrogatory, and such documents are no longer in your possession or under your control, state when such documents were must recently in your possession or under your control, and what disposition was made of them, including identification of the person now in possession of or exercising control over such documents. If the documents were destroyed, state why, when and where they were destroyed, and identify the person or persons who directed their destruction.

All of the following interrogatories shall be continuing in nature until the date of trial, and you must supplement your answers as additional information becomes known or available to you.

**NOTE**

7

**\*\*IF ANY INTERROGATORY OR REQUEST IS OBJECTIONABLE, PLEASE CALL COUNSEL FOR THE PLAINTIFF BEFORE OBJECTING, IN ORDER TO ATTEMPT TO NARROW THE QUESTION OR AVOID THE OBJECTIONABLE PORTION OR ASPECT.**

**IDENTIFY ALL DOCUMENTS ASSOCIATED WITH EACH INTERROGATORY.**

## PLAINTIFF'S FIRST SET OF INTERROGATORIES

1.  Identify all persons answering or supplying information used in answering these Interrogatories.

2.  Briefly describe your duties as Secretary of State as relates to elections in Arkansas, including congressional elections.

3.  State the name, address, and business telephone number of each person with personal knowledge regarding the facts contained in Plaintiff's original complaint and defendants' answers to each averment in the complaint..

4.  State and describe in detail all evidence including documents, affidavits, expert witness reports, charts, graphs, statements, video recordings, and emails upon which you intend to rely, or submit at the trial of this matter regarding congressional redistricting after the 2010 US census.

5.  Identify all individuals in the defendant, Arkansas Legislature who voted to approve the present congressional districting plan in 2011.

6.  Identify all individuals in the defendant, Arkansas Legislature who voted against approval of the present congressional district plan in 2011.

7.  Describe in detail how and where you maintain election data from statewide elections, including congressional elections.

8

8. Describe the voting patterns of the white voting age population in each county in each congressional district for the past ten (10) US census decennials that were completed and new congressional district lines drawn including the election data supporting your answer.

9. Describe the voting patterns of the Black voting age population in each county in each congressional district for the past ten (10) US census decennials that were completed and new congressional district lines drawn including the election data supporting your answer.

10. Describe voter turnout for each congressional election in each county in each congressional district for the past ten (10) US census decennials that were completed and new congressional district lines drawn   including the election data supporting your answer.

11. Describe in detail, "coalition voting"  and "cross-over voting" and its effect, if any,  on congressional elections in each county in each congressional district for the past 10 congressional elections and provide the election data supporting your answer

12. For each county in the 1st Congressional District presently, state the following and support your answer with election data from the most recent congressional election:  (a) total population; (b) number of white registered voters; (c) number of African American registered voters;  (d)  percentage Black voting age population; (e)  percentage white voting age population;

13.  For each county in 2nd Congressional District, state the following and support your answer with election data from the most recent congressional election:  (a)  total

9

population; (b) number of white registered voters; (c) number of African American registered voters; (d) percentage Black voting age population; (e) percentage white voting age population;

14. For each county in 3rd Congressional District, state the following and support your answer with election data from the most recent congressional election: (a) total population; (b) number of white registered voters; (c) number of African American registered voters; (d) percentage Black voting age population; (e) percentage white voting age population;

15. For each county in 4th Congressional District, state the following and support your answer with election data from the most recent congressional election: (a) total population; (b) number of white registered voters; (c) number of African American registered voters; (d) percentage Black voting age population; (e) percentage white voting age population;

Respectfully submitted,

10

Julius J. Larry III –Pro Se
2615 West 12th Street
Little Rock, AR 72202
(832) 384-6908
dr.juliusjlarry@yahoo.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiff's First Set of Interrogatories to Defendant Mark Martin has been served by and through his attorney of record on this ___ day of May, 2018, by USPS  and addressed to:


Vincent *P.* France
Assistant Attorney General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:  (501) 682-2007
Fax:   (501) 682-2591
*Attorney for State of Arkansas,*
*Arkansas Legislature, Asa Hutchinson,*
*and Leslie Rutledge*

A.J. Kelly
General Counsel and
Deputy Secretary of State
P.O. Box 251570
Little Rock, AR 72225-1570
(501) 682-3401
Fax: (501) 682-1213
*Attorney for Secretary of State*

Julius J. Larry III

11

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN (Little Rock) DIVISION

DR. JULIUS J. LARRY III, Individually      §
And in his Official Capacity as Publisher –
The Little Rock Sun Community              §
 Newspaper; ANNIE MABEL ABRAMS;
REVEREND REGINALD J. HAMPTON;              §
MARTHA DIXON; DOROTHY
JEFFERSON; SHIRLEY D. LARRY                §
individually and on behalf
Similarly-situated African Americans       §
Residing in the Southeast Quadrant of
the State of Arkansas

                                           §

PLAINTIFFS,

                                           §

                                           §

VS.                                        §          CASE NUMBER:  4:18-cv-116-KGB

                                           §

STATE OF ARKANSAS; ASA
HUTCHINSON, in his Official
Capacity as Governor of the State of       §
Arkansas; LESLIE RUTLEDGE, in
her Official Capacity as Attorney          §
General of the State of Arkansas; MARK
MARTIN, in his Official Capacity as        §
Arkansas Secretary of State and the
Arkansas Legislature, in their Official
 Capacities                                §

DEFENDANTS.

**AFFIDAVIT IN SUPPORT OF PLAINTIFF DR. JULIUS J. LARRY III'S MOTION FOR
RECONSIDERATION AND APPOINTMENT OF A SPECIAL MASTER**

1



**STATE OF ARKANSAS** §

§

**COUNTY OF PULASKI** §

**Before Me the Undersigned Notary, personally appeared Dr. Julius J. Larry III, known to me as the person making this Affidavit in Support of his Motion for Reconsideration and Appointment of A Special Master, and after having been duly sworn, deposed and stated the following**

"My name is Julius James Henry Edward Lovelace Larry III. I am 68 years old, Black African American, resident of Arkansas; registered voter in Pulaski County and voted in the most recent Democratic primary in Little Rock, AR. I am the pro se Plaintiff is the above-styled and numbered cause. I filed this case because of the continuing personal harm to me as a result of the racial gerrymandering and violation of section of the Voting Rights Act as manifested in the 1st Congressional District that adversely affects me in the 2nd Congressional District.

When I changed my residency from Houston, TX to Little Rock, AR, I was not aware that no African American or any minority had ever been elected to Congress from Arkansas since AR became a state. In Houston, I lived in the 18th Congressional District, where Hon. Sheila Jackson Lee was my Congresswoman for many years. I had a voice in Congress and when I voted, I knew my vote counted because my candidates of choice always won. Not so in Arkansas. In fact, no Democratic candidate of my choice has won since I have been a resident.

In the last Democratic primary, my candidate of choice was my friend, Jonathan Dunkley, African American, Democrat and great guy. I voted for him and, just as I had come to expect, he lost. Mrs. Annie Abrams, whose Affidavit is attached, told me the history of how Blacks in Arkansas could never elect one of their own to the U.S. Congress regardless of voter turnout. We discussed the possible reasons and I looked at the Congressional Districting map. Immediately, I noticed that the 1st CD was unusually large compared to the 2nd CD where I lived.

After doing research and looking at the Secretary of State's website, I saw the problem in 2nd CD where my county, Pulaski County, is the only Democratic county in a sea of 7 Republican counties. I knew immediately that my vote was being submerged and nullified by the overwhelming white Republican vote. Then, I discovered that Jefferson County, with a large population of Blacks, had been fractured, with part of it in the 1st CD and part in the 4th CD. However, if Pulaski County and the whole of Jefferson County were in the same congressional district, minorities would have a better chance of electing a candidate of their choice and I could realize the true meaning of one person one vote by electing the candidate of my choice.

With that goal in mind, I set out to remedy the personal injury to me caused by the problem in 1st CD, minority vote dilution in violation of section 2 of the Voting Rights Act. Because the AR Legislature put 30 counties in the 1st CD, which is almost one-half of the counties in the State, it forced and gerrymandered the 2nd CD with only 8 counties with Pulaski County the only

2

Democratic county. I am personally injured because I know my candidate of choice will lose 7 counties to 1 at every election unless something is done to abate this unconstitutional situation.

One person one vote has been taken from me due to the vote dilution problem in CD1 that has injured me in CD2, which is adjacent to CD1. My vote is submerged in CD2 and valueless. I expect and now know with virtual certainty that the candidate of my choice, if a Democrat, will surely lose in CD2 as long as CD2 remains as it is presently. I expect the AR Legislature to continue the status quo of suppressing, discouraging and creating and maintaining racially gerrymandered congressional districts into the future, thereby denying any and all minorities the opportunity to elect a candidate of their choice to Congress. Under the present burden in CD2, I will never be able to elect the candidate of my choice to US Congress. It is my personal belief that this discrimination in voting in CD2 and CD1 are by design and calculated to disenfranchise minorities, including me.

The problem in CD2 can be fixed by adopting the only majority-minority coalition map that was drawn by experts and presented in this case. By removing Pulaski County from the 2nd CD and placing Pulaski County with Jefferson County and the rest of the AR Delta and contiguous southern border where minorities live in Arkansas, the disenfranchisement of minorities will end.

Until this remedy is put in place, I will continue to be personally injured by the unconstitutional and unlawful gerrymandering in the 1st CD because the adverse effects and harm caused by are intra-district vote dilution is felt by voters in CD2, including me.

I hereby certify that all of the Exhibits attached to my Motion for Reconsideration and Appointment of A Special Master are authentic and true copies of the originals.

Exhibit A – Preliminary Findings of Dr. Rogelio Saenz – Total Population and Citizen Voting Age Population (CVAP) for Selected Race/Ethnic Groups by Exiasting Congressional Districts and Proposed 1st Congressional District.

Exhibit B – Plaintiff's First Request for Admissions to Defendants

Exhibit C – Plaintiff's First Set Of Interrogatories To Defendant Mark Martin - Secretary Of State Of Arkansas

Exhibit D – Affidavit In Support Of Plaintiff Dr. Julius J. Larry III'S Motion For Reconsideration And Appointment Of A Special Master

Exhibit E – Affidavit of Annie McDaniel Abrams In Support of Congressional Redistricting in Arkansas 2018.

Further affiant sayeth not.

Dr. Julius J. Larry III

3

SUBSCRIBED AND SWORN TO this 13th day of August, 2018, witnesseth my Hand and Seal of Office.

NOTARY PUBLIC

My Commission expires:

06-25-2025

4

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN (Little Rock) DIVISION


DR. JULIUS J. LARRY III, Individually   §
And in his Official Capacity as Publisher –
The Little Rock Sun Community            §
 Newspaper, and on behalf of all other
Similarly-situated African Americans     §
Residing in the Southeast Quadrant of
the State of Arkansas

                                         §

PLAINTIFFS,


                                         §


VS.                                      §            CASE NUMBER: 4:18-cv-116-KGB

                                         §


STATE OF ARKANSAS;  ASA
HUTCHINSON, in his Official
Capacity as Governor of the State of     §
Arkansas; LESLIE RUTLEDGE, in
her Official Capacity as Attorney        §
General of the State of Arkansas; MARK
MARTIN, in his Official Capacity as      §
Arkansas Secretary of State and the
Arkansas Legislature, in their Official
 Capacities                              §

DEFENDANTS.


STATE OF ARKANSAS  §§

                   §§

COUNTY OF PULASKI  §§


AFFIDAVIT OF ANNIE McDANIEL ABRAMS  IN SUPPORT OF CONGRESSIONAL
REDISTRICTING  IN ARKANSAS -- 2018



1

**Before Me the Undersigned Notary Public,** personally appeared Annie McDaniel Abrams, known to me personally, and after being duly sworn, deposed and stated the following:

"My name is Annie McDaniel Abrams. I am a resident of Little Rock, Pulaski County, Arkansas; registered voter and lifelong Democrat. I am an Oral Historian, Educator and Civil Rights Activist for over 65 years. My home is a History Museum. My rich personal library of books, documents and directories are used as a free reference system for many researchers examining Arkansas history. I have spoken before hundreds of audiences in schools, churches and conferences.

I was one of the first African Americans to host a public access channel in the early days of cable tv in Little Rock. I used my show, **"The State Press in Review"**, as a platform to Enlighten and Educate my audience. The show was in production for four years. Hundreds of candidates for public office have sought my advice and have requested my endorsement. I have actively served on campaign committees and helped to elect many public servants at all levels of government in Arkansas. My beliefs and commitment for fighting for Justice, Life, and Liberty for all people are respected by my family, friends, associates, allies and even my opponents.

I have worked at the national and international level for over 30 years. In 1978, I was selected to represent the National Board of the YWCA of the U.S.A. at the **World Conference to Combat Racism and Racial Discrimination**, in Geneva, Switzerland. After leaving the conference, I became a local fixture at any event focused on eliminating class disparities in Arkansas. I served as a Commissioner for the Fair Housing Commission and on the Board of Directors for Our House. I have been directly involved in the desegregation and integration of Little Rock public schools.

I know State Senator Joyce Elliott very well. I have known her many years. Specifically, I remember when Joyce Elliott ran for the U.S. House of Representatives in the 2nd Congressional District. She had a Republican opponent, Tom Griffin, a political novice. African Americans preferred Joyce Elliot. We had a Democratic governor at the time – Governor Beebe.

I asked Governor Beebe if he would help us get Joyce elected to Congress. He replied, **"Arkansas does not have but 4 eligible seats due to the population and y'all don't deserve to have one of those four"**. As a result, white Democrats supported the white Republican over Joyce Elliott, who is Black. Tom Griffin, the white Republican won over Joyce. Joyce Elliott was a faithful, loyal and hard-working, experienced Democrat, who held offices in the Democratic Party. To my knowledge, no African American has ever been elected to Congress from the State of Arkansas since Arkansas became a State."

Further Affiant Sayeth Not.

ANNIE McDANIEL ABRAMS

SUBSCRIBED AND SWORN TO this _07^th_ day of February, 2018, witnesseth my Hand and Seal of Office.

_Emma E. Rhodes_
NOTARY PUBLIC

My Commission expires:
_01-01-2021_

EMMA E. RHODES
NOTARY PUBLIC - ARKANSAS
PULASKI COUNTY
My Commission Expires: 1-1-2021
My Commission Number: 12380137

2